Wilfred PINO, Jr., Plaintiff,

v.

Stephen DALSHEIM, Superintendent, Hylan Sperbeck, Deputy Superintendent, Robert F. Egger, Correction Captain, William J. Thompson, Correction Captain, Paul Kracht, Correction Lieutenant, J. Novak, Recreation Program Leader, Downstate Correctional Facility, and Thomas A. Coughlin, III, Commissioner, New York State Department of Correctional Services, Defendants.

81 Civ. 6915 (WCC).

United States District Court, S.D. New York.

July 25, 1984.

See also 558 F.Supp. 673.

Fish & Neave, New York City, for plaintiff; Patricia A. Martone, Norman H. Beamer, Jonathan D. Zischkau, New York City, of counsel.

Robert Abrams, Atty. Gen. N.Y., New York City, for defendants; Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Stanley A. Camhi, Grace A. Brannigan, Frederick A. Cohen, Asst. Attys. Gen., New York City, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

In 1981, while incarcerated at Downstate Correctional Facility ("Downstate"), plaintiff Wilfred Pino, Jr. ("Pino") was twice disciplined for violating various institutional rules. He commenced the instant action pursuant to 42 U.S.C. § 1983 to challenge the propriety of the procedures under which he was disciplined. Although Pino originally filed a *pro se* complaint, the Court subsequently granted his application for appointment of counsel, and on May 20, 1983, his appointed counsel[1] filed an

1. The Court wishes to express its appreciation to the firm of Fish & Neave, Esqs. for its willing-

amended complaint. In this amended complaint, Pino alleges that the disciplinary procedures employed by defendants denied him due process of law as guaranteed by the United States Constitution and also violated certain rights guaranteed to him by New York State law.

A two-day, non-jury trial was conducted on December 7 and 8, 1983. This Opinion and Order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P. For the reasons set forth below, defendants' motion to dismiss at the close of plaintiff's case, upon which I had reserved decision, is denied. Judgment will be entered in plaintiff's favor to the extent set forth below. The remaining claims are dismissed.

## I.

The claims underlying this action concern disciplinary action taken against plaintiff as a consequence of two separate incidents during the summer of 1981. The first of these involved an altercation between Pino and a corrections officer on July 31st. At approximately 6:00 P.M. that day, Pino confronted Corrections Officer Bowman while he and a trainee officer were conducting a search of Pino's cell. When Bowman refused to accede to Pino's demand that the officers leave his cell, the two men began arguing, both using raised voices and profane language. At one point during the argument, which continued both at the entrance to Pino's cell and in an adjoining communal television room, Pino shouted at Officer Bowman: "You are not going into my fucking room, I'll break your ass up."

Eventually, Sergeant Bradt, the officer in charge, arrived and ordered all inmates to lock into their cells. As Pino began to walk toward his cell pursuant to this order, he stated to Sergeant Bradt, "you had better get me off this gallery before I kill him [Officer Bowman]."

Immediately following these events, Pino was keeplocked[2] in his cell. At approximately 11:30 P.M. that evening he was given two notices that inmate misbehavior reports had been filed against him. Each notice indicated the numbers of the rules that Pino was accused of having violated, and contained the location and time of the alleged incident. The rule numbers listed on the notices of report received by Pino corresponded to rules contained in a rulebook.

Pino received a rulebook in 1978 when he was admitted to Attica Correctional Facility. He read only part of this book, however, having concluded that "there were a lot of things there that were really unnecessary to read." Tr. at 135. Later, in 1978 when Pino was transferred—or, in prison parlance, "boated out"—from Attica to Great Meadow Correctional Facility, he sent his copy of the rulebook home to his family along with some of his other belongings. He was not issued a new rulebook in Great Meadow or in Downstate, where he was subsequently transferred, and thus he did not have with him a personal copy of any rulebook in 1981 at the time of the incidents complained of here. Copies of the applicable rulebook were, however, available in the prison law library and in the Special Housing Unit ("SHU").[3]

---

ness to handle this matter on a *pro bono* basis. The firm accepted this assignment from the Court without expectation of payment for the time expended on behalf of Mr. Pino. Nevertheless, throughout all aspects of this litigation, the firm has diligently represented Mr. Pino's interests and has vigorously pursued his claims. In particular, the Court would like to commend Ms. Martone and Messrs. Beamer and Zischkau for their thorough presentation of plaintiff's claim at the trial of this action. Without such admirable efforts from members of the bar of this Court, our ability completely and fairly to adjudicate the potentially meritorious claims of indigent litigants would be severely hampered.

**2.** A prisoner on keeplock status is confined to his cell full time and thus does not enjoy certain of the freedoms available to the inmate population in general.

**3.** The testimony on this point is in conflict. While Pino contends that there was no rulebook in the law library, Deputy Superintendent Sperbeck ("Sperbeck") testified that prison officials were directed to place rulebooks in the library, and that an inspector regularly checked for the presence of a copy as part of his ordinary duties. I elect to credit Sperbeck's testimony on this contested point.

Following a weekend in keeplock status, Pino appeared on August 3, 1981 before a three-member Adjustment Committee chaired by Lieutenant Paul Kracht. Following some testimony by Pino, the hearing was adjourned by Lieutenant Kracht until August 5th.

Although Pino did not reappear before the Adjustment Committee on August 5th, he was released from keeplock status on that day. Moreover, he was called before the Committee a second time on August 7th. As was the case at the August 3rd appearance, no inmates or employees other than Pino appeared at the August 7th hearing. Written reports concerning the incident were, however, filed by Sergeant Bradt and Sergeant Batis. Following that hearing, the Adjustment Committee decided to dismiss two of the charges (violations of Rules 1.75 and 1.95) against Pino, but to affirm two others (violations of Rules 1.25 and 2.30) and to refer the matter to a Superintendent's Proceeding. In his report on the August 7th appearance, Lieutenant Kracht noted that Pino displayed a negative attitude toward authority, that he freely admitted threatening the officer, and that he expressed no remorse for having done so. Following a consultation with Deputy Superintendent Hylan T. Sperbeck, Lieutenant Kracht directed that Pino be ordered confined to SHU pending the Superintendent's Proceeding.

Also on August 7th, Pino selected Joan Ryley ("Ryley"), Senior Library Clerk, from a list of 19 prison employees available to assist him with the Superintendent's Proceeding. On August 13th, Ryley delivered a formal written charge to Pino, which accused him of violating prison rules as follows:

(1) 1.25 Disturbance; creation, participation or inciting others to participate.

(2) 1.95 Riot or inciting others to Riot.

(3) 2.30 Threats toward other Inmates or Employees.

(4) 3.30.11 Loud and boisterous conduct.

On July 31, 1981, at approx. 8:10 P.M., while on 4F Gallery, you created a disturbance by threatening Officer Bowman because he was in your cell. Even though Sgt. Bradt explained to you that it was the Officers [sic] job to do visual security checks you still proceeded to be loud and boisterous, and shouted at Officer Bowman, "You are not going into my fucking room, I'll break your ass up." When Sgt. Bradt gave you a direct order to lock in, while walking to your cell you stated, "You had better get me off this Gallery before I kill him," meaning Officer Bowman.

In behaving in this loud and boisterous behavior, you incited other Inmates to participate in this confrontation.

J. Castro 79 A 2824

E. Pagan 78 B 1107

R. Soto 78 A 4144

Ryley also gave Pino a copy of Chapters V and VI of the New York State Correctional Service Rules and Regulations and explained the nature of the Superintendent's Proceeding to him. In response to the first two formal charges, Pino explained to Ryley that his argument with Officer Bowman was personal and at no time did he attempt to involve others. He told Ryley in response to the third charge that he verbally threatened the Officer only after the Officer got into a karate stance, which served to escalate the confrontation. Finally, he admitted being loud as alleged in the fourth charge.

Moreover, also at their August 13th meeting, Pino requested that Ryley interview inmates Castro, Pagan, and Soto. In response to this request Ryley interviewed and obtained written statements from these three inmates and inmate Franciotti prior to the Superintendent's Proceeding. The written statements from these four inmates all corroborate, to varying degrees, Pino's story that he was loud and threatened the officer in response to the officer's taunts.

On August 14, 1981, Captain Robert Egger conducted a Superintendent's Proceeding on the charges filed against plaintiff. Prior to the date of that Proceeding, Pino had spent six days in keeplock and had been confined to SHU for seven days as a

result of the charges filed against him on July 31st. Pino appeared at the Proceeding, which lasted approximately 15–20 minutes, but no other live witnesses were called. Captain Egger commenced the hearing by reading the formal charge to Pino and then asking Pino to admit, deny, or propose an acceptable variation for each specific charge. In this context, he was afforded a more than ample opportunity to explain orally his version of the events. During the course of the questioning by Captain Egger, Pino denied violating Rules 1.25 and 1.95, but admitting making threats in violation of Rule 2.30 [4] and engaging in loud conduct in violation of Rule 3.30.11. In addition, he contended that if he had been given a rulebook, the incident would never have happened because he would not have questioned Officer Bowman's presence in his cell in the first instance.[5]

At the conclusion of the Proceeding, Captain Egger announced that he would dismiss charge 1.95 but would affirm charges 1.25, 2.30, and 3.30.11. He also announced his recommendation that Pino receive 45 days in SHU (with credit for time already served), 90 days' loss of good time, and 45 days' loss of commissary, packages, and home phone privileges.

On August 31, 1981, Pino was given a written report of the Superintendent's Proceeding, which summarized, *inter alia,* the basis for Captain Egger's decision and the explanation offered by Pino for his conduct. Deputy Superintendent Sperbeck subsequently reviewed the Superintendent's Proceeding and found that it complied with Chapter V of 7 N.Y.C.R.R. Although Pino appealed Captain Egger's disposition to Superintendent Dalsheim, Dalsheim notified plaintiff on September 10th that he would not modify the decision.

While Pino was in SHU awaiting the August 14th Superintendent's Proceeding, he was involved in another incident which gave rise to a second wave of disciplinary proceedings against him. On the morning of August 12, 1984, plaintiff was asked to step out of his cell in SHU while it was searched by corrections officers. During the course of that search, the officers uncovered a four-by-six-inch cellophane package containing a greenish substance believed to be marijuana. When confronted with this contraband by the officers, Pino denied any knowledge of the bag's existence and asked to be taken to the hospital for tests that would determine whether he had recently used any marijuana. He was, however, never taken for any such tests.

That same day, Pino was given a Notice of Report by Officer LiVelli, which informed Pino that LiVelli had filed a Misbehavior Report charging him with violating Rules 1.30 and 1.33. As was the case with the two Notices of Report given to Pino in connection with the July 31st incident, this Notice gave Pino no information about the charges beyond the bare rule numbers. Pino was, however, advised orally by Officer Weiman that the charges involved possession of contraband and a controlled substance.

On August 14, 1981, the Adjustment Committee chaired by Lieutenant Kracht directed that a Superintendent's Proceeding be conducted concerning the August 12th charges. Pino was not informed that the August 14th Adjustment Committee hearing was to take place, nor was he present at that time. On August 17th, John Novak ("Novak"), the prison's Recreation Program leader, was appointed to

---

**4.** Plaintiff's contention that he would not have admitted violating Rule 2.30 by making "threats" had he known the broader meaning of the term "threats" is simply untenable. Pino's testimony on this point was simply unworthy of belief, and counsel's argument is illogical. See generally Tr. at 79–88.

**5.** It is, of course, hard for the Court to reconcile this reasoning with Pino's continued insistence throughout trial that Officer Bowman's search

was an illegal search. If this latter position is correct, then Pino's verified knowledge that the search was improper could only have fueled the intensity with which he confronted the Officer. On the other hand, if the search was proper, then Pino, a veteran of numerous years incarceration in DOCS facilities, including several months in Downstate, must certainly have known of its propriety.

assist plaintiff with the Superintendent's Proceeding. Unlike the first disciplinary action in which Pino selected his employee assistant from a list of numerous available prison employees, in this instance Novak was not initially selected by Pino. Pino did, however, accept Novak as his assistant.

On August 18, 1981, Novak delivered the formal charge to Pino and gave him a copy of Chapters V and VI of 7 N.Y.C.R.R. The formal charge advised Pino that he was charged with violating Rules 1.30 and 1.33 as follows:

(1) 1.30 Contraband

(2) 1.33 Drugs, controlled substance

On August 12, 1981, at approx. 11:25 A.M., Officer Weiman and Officer LiVeli did a cell search on your cell and found one-half a cigarette under the black baseboard near the cell door. Upon a further search, a cellophane bag one-half full of a leafy green substance was also found under the base-board to the right rear of the toilet. Both substances were tested by Sgt. Boyes with a Dequenois-Levine Test E Kit and proved positive for marijuana.

During the course of their meeting, Pino asked Novak to interview two inmates, Maggette and Torres. Pino gave Novak a copy of a letter he had obtained from Torres—in which Torres stated that an inmate named Bo told him that the marijuana was not Pino's, but had been stashed in the cell by Bo before he was transferred out of SHU—and asked Novak to verify from Torres that he had written the statement freely and without any coercion by Pino. In furtherance of Pino's request, Novak spoke to both Maggette and Torres; Torres verified his letter but Maggette declined to comment. Pino also requested that Novak examine the SHU logbook to ascertain the identity of the prior occupants of his cell

and to determine when the cell had last been searched. Novak failed, however, to carry out that request.

On August 20–21, 1981, Lieutenant William Thompson conducted a Superintendent's Proceeding on the contraband charges against Pino. Pino appeared at the hearing and denied the charges against him; no other live witnesses testified before the lieutenant. At the first session of the Proceeding on August 20th, Pino and Lieutenant Thompson discussed the issues raised in the letter submitted by inmate Torres, and Pino requested that the lieutenant check the SHU logbooks in an effort to identify the mysterious inmate "Bo." The hearing was then adjourned so that Thompson could investigate these matters.

When the Proceeding reconvened on August 21st, Lieutenant Thompson informed Pino that the three prior occupants of the cell referred to in the Torres letter were inmate Diaz (who had since been transferred to another facility), who was preceded by inmate Reason (who had also been transferred), who in turn followed inmate Craft into the cell. Pino then told Thompson that "Bo" was not inmate Diaz, but was a black man. Lieutenant Thompson, however, refused to investigate any further, stating:

> Alright. I am not going to try to identify the inmate and ... [even] if we could identify him, which is doubtful, then we'd have to take the time and the expense to track him down; and, like I say, it is very, very doubtful that the man would admit to making such a statement, anyway, even if he did make it.[6]

Moreover, as Pino attempted to offer an additional comment, Thompson cut him off, stating: "Well, I can't see where that alters the fact that the substance was found in your cell."[7] Following this remark, the

---

**6.** At trial, Pino testified that "Bo" must have been inmate Reason, based upon the overlap of the dates of Reason's confinement in the cell and the date noted by inmate Torres. Presumably even a minimally searching inquiry by Lieutenant Thompson could have uncovered

that relationship at the time of the Superintendent's Proceeding.

**7.** There is also no evidence that either Lieutenant Thompson or John Novak, Pino's employee assistant, undertook to check the SHU logbook, as requested by Pino, to determine when Pino's

lieutenant announced his determination that Pino receive 90 days' loss of good time, 90 days in SHU, and 60 days' loss of packages, commissary, and home phone privileges, to run consecutively with the punishment Pino was then serving because of the July 31st incident.

Lieutenant Thompson memorialized his determination in a written report, which was given to Pino on August 31st. As his reasoning for the substantial punishment he imposed upon Pino, Thompson wrote:

> Based on the evidence that the controlled substance, marijuana, was found in your cell (possession) and that we are unable to identify inmate "Bo" and if we were able to do so it is extremely unlikely he would admit to placing the marijuana cigarette in your cell, all charges are affirmed. In accordance with the guidelines set down by the Commissioner of Correction and I feel that substantial evidence is provided, the above disposition is justifiable.

Deputy Superintendent Sperbeck subsequently reviewed the August 20–21 Superintendent's Proceeding and found it to comply with Chapter V of 7 N.Y.C.R.R. Pino was ultimately released from his tour in SHU resulting from these two incidents on November 4, 1981.

## II.

■ The starting point for any constitutional analysis of prison disciplinary procedures is obviously the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Court in *Wolff* set forth the minimum requirements of procedural due process for inmates facing disciplinary proceedings which could result in the loss of a constitutionally protected liberty interest. Although *Wolff* was concerned primarily with an inmate's potential loss of good-time credits, the Second Circuit ruled in

*McCann v. Coughlin,* 698 F.2d 112 (2d Cir.1983), that where an inmate faces a possible punishment of at least fourteen days in keeplock, or the more serious deprivation of any period of confinement in SHU, he is confronted with a sufficiently serious deprivation of his liberty to require that he be accorded due process protection. *See id.* at 121. Thus, as I noted in my November 17, 1983 Opinion denying summary judgment in this action, there can be no doubt that Pino was entitled to basic due process protections when he was subjected to the two disciplinary proceedings at issue here.

■ The goal of due process in the prison context, as elsewhere, is fair adjudication. *See McCann,* 698 F.2d at 122. However, an inmate's rights are necessarily limited by the fact of his confinement, and accordingly he is not always entitled in the prison disciplinary process to full procedural protections such as those afforded at a criminal trial. *Id.* As set forth by the Court in *Wolff,* the minimum requirements of procedural due process include advance written notice of the claimed violation and a written statement from the factfinders describing the evidence they relied upon and the reasons for the disciplinary action they took. *See* 418 U.S. at 563, 94 S.Ct. at 2978. In addition, an inmate must be given a meaningful opportunity to marshal and present evidence in his defense. *See id.* at 564, 570, 94 S.Ct. at 2978, 2981. To this end, he should ordinarily be permitted to call witnesses and present documentary evidence in his defense, so long as "permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." [8] *Id.* at 566, 94 S.Ct. at 2979. An inmate does not, however, have the right to confront or to cross-examine the witnesses against him, *id.* at 567–69, 94 S.Ct. at 2980–81, nor does he have a right to counsel

cell had last been searched and whether other persons had access to the cell subsequent to that prior search.

**8.** Because of the nature of institutional life, prison officials are vested with discretion to keep a

disciplinary hearing within reasonable limits and to refuse to allow inmates to call witnesses or to collect statements when, in the officials' judgment, the institutional dangers are present.

(either retained or appointed) in the disciplinary process. *Id.* at 570, 94 S.Ct. at 2981.

 The courts in this Circuit, flooded in recent years by a wave of prisoners' litigation, have of necessity added several layers of flesh to the skeletal requirements established in *Wolff.* Thus, it is settled that members of the disciplinary committee must be fair and impartial. *See McCann,* 698 F.2d at 122. In addition, the inmate must receive the required written notice of the charges against him at least 24 hours prior to any disciplinary hearing. *See id.* at 121. Furthermore, the inmate's right to call witnesses has been characterized by the Second Circuit as mandatory, subject only to "the narrow exception ... [for] the unusual situation where allowing an inmate to call a witness would jeopardize institutional safety."[9] *Id.* at 123.

 In addition to the procedural due process requirements of the federal Constitution, New York State has enacted a comprehensive set of laws and regulations applicable to the prison disciplinary process. Among the rights and procedures provided by State law are:

(1) the right to be provided with written copies of all institutional rules and regulations defining and prohibiting inmate misconduct; N.Y.Corr.Law § 138(2) (McKinney Supp.1983–84);

(2) the right not to be disciplined except for a violation of a published and posted written rule or regulation, a copy of which has been provided the inmate; N.Y.Corr.Law § 138(5);

(3) the right to a Superintendent's Proceeding within 7 days of confinement to keeplock or SHU; *see, e.g., Grosvenor v. Dalsheim,* 90 A.D.2d 485, 454 N.Y.S.2d 553 (1982); *Shahid v. Coughlin,* 83 A.D.2d 8, 444 N.Y.S.2d 264 (1981);

(4) the right to select an employee assistant from a list of available employees established by the Superintendent; 7 N.Y.C.R.R. § 253.3(a);

(5) the right to receive investigatory assistance from the employee assistant concerning any reasonable factual claim the inmate may make; 7 N.Y.C.R.R. §§ 253.3(a) and (b);

(6) the requirement that the hearing officer interview the employees who witnessed or have direct knowledge of the incident; 7 N.Y.C.R.R. § 253.4(c).

(7) the right to receive a written statement from the hearing officer at the Superintendent's Proceeding of the evidence relied upon and the reasons for the disciplinary action taken; 7 N.Y.C.R.R. § 253.4(i).

Moreover, a charge against an inmate may be affirmed by the official conducting the Superintendent's Proceeding only if the record of the proceeding contains substantial evidence in support of the charge. 7 N.Y.C.R.R. §§ 253.4(g) and (h).

### III.

 Turning first to the disciplinary proceedings arising from the July 31, 1981 incident involving Pino and Officer Bowman, there can be little doubt that the notice of the charges provided to Pino prior to his appearance before the Adjustment

---

**9.** It is inconceivable to me that defendants continue to insist that the law was unclear in 1981 concerning an inmate's right to call witnesses. To the contrary, as the court noted in *McCann,* the inmate's right to call witnesses was established in this Circuit as far back as 1979. *See McCann,* 698 F.2d at 124–25. Moreover, to the extent there may have existed even the slightest doubt in 1979 concerning the witness requirement, this Court's decision in *Powell v. Ward,* 487 F.Supp. 917 (S.D.N.Y.1980), *aff'd,* 643 F.2d 924 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981), clearly put the Department of Corrections on notice of the mandatory nature of the constitutional requirement.

*See* 487 F.Supp. at 928. Defendants' argument that *Powell* should not be considered here because it concerned only the Bedford Hills Correctional Facility can charitably be described as unpersuasive. Regardless of whether the injunctive relief ordered in that action technically bound only the parties to that dispute and regulated only the procedures at Bedford Hills, the constitutional principles articulated were not institution-specific. Thus, New York Corrections Officials must be charged with awareness of the potential applicability of *Powell* to other facilities under DOCS control which were then employing similarly deficient disciplinary procedures.

Committee failed adequately to satisfy the advance written notice requirement of *Wolff.*[10] The Notices of Report, with their bare references to rule numbers, were the only documents given to Pino before his appearance. Indeed, this same form of notice was held to be constitutionally insufficient by Judge Stewart in *Powell.* *See* 487 F.Supp. at 926–27. As explained by Judge Stewart, in the event that the inmate does not have access to a rulebook, it is quite possible that he will have no knowledge of the precise nature of the charges against him until he actually appears at the Adjustment Committee hearing, *see id.,* where he is expected to comment upon those charges. This observation is especially applicable to the instant case, where, whether justifiable or not, Pino did not have access to a rulebook between the time of the incident and his appearance before the disciplinary committee.[11] He had not retained his copy of the rulebook when he was transferred to Downstate from another DOCS facility, he was not issued a new rulebook at any time during his incarceration at Downstate, and he did not have access to the copies maintained in the prison law library and SHU because he was confined to his cell on keeplock status.

■ In all other respects, however, the disciplinary proceedings flowing from the July 31st incident comported fully with the requirements of due process and State law. Although plaintiff makes much ado about the fact that Lieutenant Kracht conferred with Deputy Superintendent Sperbeck before determining that Pino should be confined to SHU pending a Superintendent's Proceeding, there was nothing improper about that consultation. It must always be remembered that, above all, prison officials are charged with maintaining the security of and order within their institutions. To the extent that Lieutenant Kracht sought advice from the Deputy Superintendent on whether temporary isolation of the prisoner was warranted in this particular instance pending a Superintendent's Proceeding at which the prisoner's guilt or innocence would ultimately be determined, the Lieutenant was acting in furtherance of those fundamental goals. Indeed, in light of the Supreme Court's repeated pronouncements in *Wolff* that great deference is to be paid to prison administrators on matters involving prison security, I would be loath to rule that communication between two prison officials on a matter directly related to maintaining order is improper.[12]

■ Moreover, I do not believe that Pino was denied his right to call witnesses given the nature of the issues in dispute in this first disciplinary action. While there can be no doubt that a prisoner should ordinarily be permitted to call witnesses in his defense, the prisoner's right is obviously not unbridled and must at minimum be subject to a preliminary showing that the proposed witnesses may have probative testimony to offer. Here, however, the initial question of guilt was not in dispute. Pino himself freely and knowingly admitted to being loud and to making the threatening statements which served as the basis for the misbehavior charges. Consistent with this, the written statements of the other inmates with knowledge of the incident demonstrate that their testimony would go only to the issue of whether there existed mitigating circumstances for the acts committed by Pino; none of the prisoners stated in his written letter submitted

---

**10.** Inmates are, of course, entitled to constitutional due process safeguards at the Adjustment Committee stage of the disciplinary process. *See McCann,* 698 F.2d at 122. The Adjustment Committee is authorized, *inter alia,* to confine an inmate to SHU. *See* 7 N.Y.C.R.R. § 252.5.

**11.** Of course, it does not follow directly that Pino's confinement was caused by this violation. That issue is discussed *infra.*

**12.** I also note that even in the context of a full criminal trial, it is not considered improper for a member of the judiciary to consult with his colleagues concerning the proper sentence for a convicted defendant. Indeed, many would consider it desirable to obtain a second opinion on the sentence that is appropriate under the circumstances. Certainly nothing more egregious than that was accomplished by Kracht's consultation with Sperbeck.

on Pino's behalf that Pino did not commit the acts charged in the Formal Charge.

█ The presence of mitigating circumstances goes only to the magnitude of a possible punishment and not to the preliminary question of whether the prisoner in fact committed the misbehavior charged. On the punishment question, a prisoner, like a criminal defendant, does not have a right to call live witnesses on his behalf. While prison officials obviously may exercise their discretion to allow the calling of witnesses in this situation, nothing in *Wolff* or *McCann* mandates such a practice. Unless special circumstances exist, written statements in this context will ordinarily suffice.

█ In addition, I have no doubt that the formal charge delivered to Pino by Joan Ryley on August 13, 1981 met both the timing [13] and substantive notice requirements of *Wolff*. The formal charge advised Pino of the specific rules he was accused of violating and the nature of his conduct that was deemed violative of those rules. It also provided a brief description of the factual allegations underlying the charges. This information gave Pino an adequate basis upon which to respond knowingly to the allegations against him and to attempt to marshal a defense. In the context of prison disciplinary action, this opportunity effectuates the constitutional guarantee of procedural due process. I simply cannot accept the argument of plaintiff's counsel that the formal charge must in effect explain every technical element of the violations charged, distinguish between different degrees of similar types of misbehavior, and list the ranges of punishment for each type of misbehavior in order to satisfy constitutional requirements. While in some cases this detailed information may be informative, or indeed even helpful to the inmate, it is not essential to the fundamental fairness of the disciplinary process. Here, the charge as formulated gave Pino a sufficient basis on which to contest the misbehavior allegations. This is all that due process mandates in prison disciplinary proceedings.

█ Similarly, the written report furnished to Pino following the Superintendent's Proceeding satisfies the constitutional requirement that an inmate be provided with a " 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Wolff*, 418 U.S. at 564, 94 S.Ct. at 2979 (citation omitted). Contrary to plaintiff's contention, the requisite statement need not discuss and analyze every argument raised by the inmate. Rather, the requirement that the factfinder give reasons for his decision is to protect against the possibility of arbitrary decision-making and "to protect the inmate against collateral consequences based upon a misunderstanding of the nature of the original proceeding." *Id.* at 565, 94 S.Ct. at 2979. The written report provided to Pino in this case, albeit quite brief, adequately meets these concerns.

█ Finally, I cannot conclude, on the basis of the record presented, that Pino's special confinement prior to his Superintendent's Proceeding violated the apparently unwritten DOCS rule that an inmate be afforded a Superintendent's Proceeding within seven days of his segregation.[14] Although there is no doubt that the seven-day rule is binding on defendants, *see, e.g., Johnson v. Smith*, 83 A.D.2d 721, 442 N.Y.S.2d 648 (1981), plaintiff has not demonstrated that the rule was violated in this instance. As interpreted by New York courts, the rule requires "in the absence of exigent circumstances, that for inmates confined and awaiting a superintendent's

---

**13.** Notification of the charges the day before the Superintendent's Proceeding meets the 24-hour minimum notice requirement of *Wolff*. *See* 418 U.S. at 564, 94 S.Ct. at 2978.

**14.** I previously ruled in my November 17, 1983 Opinion and Order in this action that Pino's special confinement pending commencement of

a Superintendent's Proceeding was not a violation of his rights under the federal Constitution, regardless of whether it contravened State law. *See Pino v. Dalsheim*, No. 81 Civ. 6915, slip op. at 7–8 (S.D.N.Y. Nov. 17, 1983); *see also Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

proceeding the proceeding must be held within seven days." *Id.* 442 N.Y.S.2d at 649. Here, Pino was confined on keeplock status for six days while awaiting a determination from the Adjustment Committee, was released into the general prison population for two days, and then was confined to SHU for seven days pending the commencement of the Superintendent's Proceeding. He was thus specially restricted for only seven days, within the mandatory limit, prior to being afforded a Superintendent's Proceeding. The earlier six days in keeplock are not properly chargeable to that limit because Pino was not awaiting a Superintendent's Proceeding at that time.[15]

### IV.

In contrast to the first disciplinary proceedings, the second round of disciplinary action taken against Pino as a result of the marijuana incident in SHU suffered from several basic flaws that directly undermined the fundamental fairness of the entire process. As in the first set of disciplinary proceedings, Pino was provided in this instance with a notice of report listing the alleged violations only by rule number, without any sort of substantive explanation or description. As noted above, such a procedure fails utterly to comply with the notice requirements of due process, a failure which had been announced by this Court prior to the time of the incidents underlying this action.

 Moreover, unlike the first disciplinary sequence, Pino was here denied an opportunity to call witnesses at the Superintendent's Proceeding without any explanation by defendants that would justify such a denial. Defendants' own testimony establishes that under the procedures in effect at Downstate in 1981, inmates were not permitted to call live witnesses at ei-

ther stage of the disciplinary process. Thus, although Pino did not call inmate Torres, he testified that he did not do so because he knew such a request would be fruitless. In this situation, I must conclude that Pino did not waive his right to call witnesses. *See McCann*, 698 F.2d at 123. There being no evidence of any threat to security or other circumstances that would justify a departure from the ordinary rule that a prisoner be permitted to call witnesses in his defense, this denial too contravenes the minimum requirements of *Wolff.*

 Beyond these infirmities, however, are two more serious errors of constitutional magnitude. First, the record demonstrates that the assistance provided by John Novak, Pino's assigned employee assistant,[16] was less than adequate. Pino was charged with possession of marijuana by virtue of the contraband's presence in his cell in SHU. Pino testified, however, that prior to entering SHU initially, and each time he reentered SHU thereafter, he was subjected to a complete strip search, which always included an examination of his body cavities. The existence of such a thorough pre-entry search procedure when viewed in conjunction with the statement of inmate Torres lends at least arguable credence to Pino's assertion that the marijuana was not his. In light of the patent reasonableness of Pino's defense, the essence of which was known to Novak at the time he was acting as Pino's employee assistant, Novak should certainly have carried out Pino's request that the SHU logbook be examined for the identities of the most recent prior occupants of his cell and the date the cell was last searched if the employee assistance was to have any real value. Because Pino was then confined in SHU and was unable to obtain personal

---

**15.** In any event, even if the seven-day rule were violated here, Pino suffered no actual damage as a result of that violation. As noted above, his sentence on the first charge was 45 days in SHU with credit for time served. Thus, the time Pino spent in SHU prior to the Superintendent's Proceeding is time he would have spent there anyway.

**16.** Although not rising to the level of a constitutional deprivation, the fact that Pino was assigned an employee assistant rather than being afforded an opportunity to select an assistant from a list provided by the Superintendent, as provided for by 7 N.Y.C.R.R. § 253.3(a), is itself a violation of State law.

access to the relevant SHU records, his only opportunity adequately to present his defense was dependent upon the cooperation of prison authorities, beginning with the efforts of his assigned employee assistant. If, as here, the employee assistant fails without justification to carry out the most basic, reasonable, and non-disruptive requests of the inmate, the inmate is effectively denied an opportunity to marshal facts for his defense, in direct contravention of the minimum procedural requirements recognized in *Wolff.*

 Similarly, the failure of the official conducting the Superintendent's Proceeding to consider in good faith the substance of the inmate's defense extends the mockery of due process begun by the employee assistant and renders the Superintendent's Proceeding an empty formality. At his Superintendent's Proceeding, Pino asked Lieutenant Thompson, the presiding officer, to pursue the logbook investigation that Novak had failed to carry out, in an effort to identify the inmate referred to in inmate Torres' written statement.[17] Although Thompson adjourned the Proceeding for this purpose, the record reveals that his investigatory efforts were perfunctory and half-hearted. When he reconvened the hearing he had discovered the names of the three prior occupants of the cell, but refused to pursue the matter further, stating that it would take considerable effort and would probably not matter in the longrun because "Bo" would likely not implicate himself. Of course, if this were Thompson's view, there was little need for him to obtain the names in the first place for names, without more, are obviously useless.

Moreover, Thompson's utter refusal even to entertain the possibility that the marijuana could have belonged to someone other than Pino is further demonstrated by his statement that Pino's attempted showing would not alter the fact that the contraband was found in his cell. Surely if Pino could successfully show that the marijuana was placed there by another inmate without Pino's knowledge, no rational factfinder could find him guilty of possession of contraband. Moreover, Lieutenant Thompson could not have given due consideration to Pino's defense if he would not expend the minimal time involved in determining when Pino's cell had last been searched. This was a reasonable request that Pino made of both Thompson and Novak, which was not honored by either official. In light of all these factors, I must conclude that the disciplinary action taken against Pino at this Superintendent's Proceeding resulted from violations of due process under any standard.

## V.

 The remaining question concerns the proper remedy to be ordered for the violations of Pino's rights by defendants. Plaintiff seeks broad injunctive relief and awards of compensatory and punitive damages against all defendants.[18] Under § 1983, a plaintiff must prove more than a mere violation of his constitutional rights in order to collect an award of monetary damages; he must demonstrate that the deprivation caused him actual injury. *See Carey v. Piphus,* 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978); *McCann,* 698 F.2d at 126. A plaintiff who cannot demonstrate causation may collect only nominal damages. *See Carey,* 435 U.S. at 266, 98 S.Ct. at 1053; *McCann,* 698 F.2d at 126.

 Here, there has been no showing of actual injury resulting from the one constitutional violation in the first proceeding. Pino's lack of adequate, formal notice continued only prior to his appearance before the Adjustment Committee. However, the Adjustment Committee was only an interim stage in the disciplinary process,

---

**17.** It should be noted that had inmate Torres been called to testify, he could have easily been asked for additional details that would have facilitated the identification of inmate "Bo."

**18.** The Court is, of course, without power in this proceeding to restore Pino's lost good time credits.

and final action was not taken against Pino until after a Superintendent's Proceeding. Before his Superintendent's Proceeding, Pino was given formal written notice of the charges against him that more than complied with due process minimums. Moreover, the evidence clearly indicates that even at the Adjustment Committee stage, Pino had actual knowledge of the precise nature of the charges against him and was able knowingly to put forward his position with respect to the alleged misbehavior. Although actual knowledge is, as plaintiff contends, irrelevant to the issue whether a due process violation has occurred, it does go to the question of damages. In this situation, even if Pino had received more complete notice of the formal charges against him prior to the Adjustment Committee, it would not have made a difference. He thus suffered no actual injury as a consequence of this violation.

■ On the other hand, the actual injury suffered by Pino as a result of the violations in the second disciplinary process is unmistakable. Not only was Pino denied his right to call live witnesses, but he was deprived of any meaningful opportunity to marshal the facts necessary to his defense to the contraband charge and to have that defense considered by an impartial factfinder. These violations infected the disciplinary proceeding in a way that undermined the fundamental fairness of the process. There is reason to believe that if Pino had been afforded those rights which he was wrongly denied, he might well have been acquitted of the entire charge.

As a result of this second disciplinary action, Pino was forced to spend 45 days in SHU. While in SHU, Pino was deprived of many activities and opportunities available to other inmates, including commissary, recreational, library, and home phone privileges. In addition, while in SHU Pino was confined to his cell virtually 24 hours a day, being allowed only one hour of exercise each day after his initial five days of special confinement. By contrast, inmates in the general prison population are ordinarily confined to their cells only at night and for limited periods during the day. Although it is a difficult task to arrive at a monetary sum that can fairly compensate an individual for the unfavorable conditions he endured during his time in SHU, I conclude that an award of $25.00 per day is appropriate. In arriving at this sum, I note that the Second Circuit has approved the reasonableness of this amount in a case involving confinement under similar conditions. *See Sostre v. McGinnis*, 442 F.2d 178, 205 n. 52 (2d Cir.1971). In addition to the $25.00 per day, Pino will be entitled to recover the $52.00 per month income from his library clerk's job that he lost during the 45-day period in SHU.

■ Liability for the monetary award will be joint and several among those defendants who were personally involved in the second disciplinary process. This includes Lieutenant Kracht, who chaired the Adjustment Committee; John Novak, who was assigned to provide Pino with assistance; Lieutenant Thompson, who conducted the Superintendent's Proceeding; Deputy Superintendent Sperbeck, who reviewed the Superintendent's Proceeding; Superintendent Dalsheim, who appointed Novak to assist Pino, who was the addressee on the letter from inmate Torres, who appointed the hearing officers, and who was otherwise generally responsible for the Downstate disciplinary process; and Commissioner Coughlin, who received actual notice of the proceedings pursuant to the automatic review procedure of 7 N.Y.C.R.R. 270.2. Pino is also entitled to an award of nominal damages against those who were involved in the Adjustment Committee stage of the first disciplinary proceeding. This includes Coughlin, Dalsheim, Sperbeck, and Kracht.

■ It is also obvious that plaintiff is entitled to expungement of his disciplinary record concerning the marijuana incident if he is to be accorded full relief in this action. An inmate's disciplinary file is used collaterally by prison authorities in making other decisions concerning the nature and length of the inmate's confinement. *See Powell*, 487 F.Supp. at 935 n. 16. Because

Pino has demonstrated that the second disciplinary record in this case was created at the expense of his constitutional and state-created rights, it is entirely improper for DOCS to be permitted to consider that record in making its future decisions. Accordingly, I order that Pino's disciplinary file be expunged of any reference to that incident. On the other hand, I do not believe that Pino is entitled to a remedy of expungement on the first disciplinary incident. As noted above, the one procedural violation in that entire process had no effect on the reliability of the outcome, and accordingly that outcome should not be voided. Defendants will, however, be enjoined from instituting further disciplinary proceedings against Pino for either of the incidents underlying the instant action. Finally, I decline to award punitive damages to plaintiff. The actions of these defendants simply did not involve the sort of malicious or reckless conduct that would justify such an award.

## VI.

For the reasons stated above, judgment will be entered in favor of plaintiff jointly and severally against defendants Kracht, Novak, Thompson, Sperbeck, Dalsheim, and Coughlin in the amount of $1,203.00 ($1,125 for 45 days confinement in SHU plus $78.00 for 45 days' loss of pay). Judgment will also be entered in plaintiff's favor against defendants Coughlin, Dalsheim, Sperbeck, and Kracht for nominal damages arising from the first incident. Defendants are further ordered to expunge Pino's file of all references to the marijuana incident and subsequent disciplinary action, and they are enjoined from commencing further disciplinary action against plaintiff arising out of the underlying incidents. Plaintiff's counsel are directed to submit a Proposed Judgment in accordance with the terms of this Opinion and Order within five days on five days' notice. In addition, plaintiff's counsel should submit their application for an award of attorney's fees pursuant to 42 U.S.C. § 1988 no later than three weeks following the entry of Judgment. Defendants will have two

weeks to respond to any such application and plaintiff may take an additional week to reply. The Court will determine whether an award of fees is warranted and the amount of any such award on the basis of those papers unless it becomes apparent that an evidentiary hearing is necessary.

SO ORDERED.