Raul SOTO, Plaintiff,

v.

Gordon LORD, Program Coordinator of Downstate Correctional Facility, Defendant.

No. 86 Civ. 1916 (KC).

United States District Court,
S.D. New York.

Aug. 9, 1988.

Daniel H. Weiner, Hughes, Hubbard & Reed, New York City, for plaintiff.

Charles C. Davis, Jr., Dept. of Law, New York City, for defendant.

## OPINION AND ORDER

CONBOY, District Judge:

The plaintiff in this action, brought pursuant to 42 U.S.C. section 1983,[1] claims the defendant violated his constitutional rights in conducting a prison disciplinary proceeding that failed to conform to due process requirements. The matter was tried before the court sitting without a jury on June 16, 1988. This Opinion and Order incorporates the court's findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52.

## CHRONOLOGY

In 1981, plaintiff, serving a sentence of seven and a half to fifteen years imprisonment, received a transfer from Comstock Correctional Facility to Downstate Correctional Facility. Plaintiff's counselor at Comstock had recommended the transfer after receiving, in 1980, a letter from a doctor at Columbia Presbyterian Medical Center. The letter "strongly recommend[ed] that [the plaintiff] be moved to a facility closer to home so that" plaintiff's daughter, then approximately three years

---

1. The plaintiff filed his complaint *pro se*. At a later time, the firm of Hughes, Hubbard & Reed undertook the plaintiff's representation *pro bono publico*. The court expresses its apprecia- tion to that firm and particularly to Daniel H. Weiner, Esq., who acted as attorney of record and trial counsel.

old, and suffering developmental retardation, could "have more frequent contacts with her father." Complaint Ex. D1. The transfer provided the plaintiff more frequent opportunities to see his daughter, because the trip to Downstate was not unduly taxing to his wife and daughter.[2] While at Downstate, the plaintiff was visited by his wife and daughter "[a]t least three times a month." Trial Transcript at 14 [hereinafter "Tr. x."].

While incarcerated at Downstate the plaintiff conducted himself admirably. The only blemish on his record prior to the incident in question was a single period of special, punitive confinement in 1981.[3] Tr. 40.

In February 1985, the plaintiff was an "honor inmate," Tr. 15, entitled to have overnight visits with his wife and daughter in a trailer at the prison. Tr. 14–15. Additionally, he held at least three jobs within the prison, working as "the coordinator of the chaplaincy programs," which included a religious encounter program, as a chaplain's assistant, as coordinator of a drug rehabilitation program, and as secretary of the Legion of Mary, a program run by the chaplain. Tr. 12–13. He received the maximum pay an inmate could receive, "about $1.55 a day." Tr. 13. Further, the plaintiff was attending Marist College, trying to achieve a "[J]ustice [C]ertificate, which is a 60 credit college program," id., and was participating in the New York State Regents external degree program, trying to achieve a bachelor's degree. Tr. 13. He was at that time about six credits short of obtaining an associate degree. Tr. 13. Because the plaintiff was an honor inmate, and was within a year of his release date (November 1985), in early 1985 he was eligible for furloughs, which allowed him to go home and spend time with his family, and for work releases. Tr. 16.

In January 1985, the plaintiff received a three day furlough, which he used. Tr. 16. When he returned to Downstate, the plaintiff underwent a urine test to test for drug use. Id. The test result was negative. Plaintiff testified that he was also tested after family overnight visits. This was "standard procedure." Tr. 15. Plaintiff testified that he submitted to thirteen or fourteen urine tests after these visits. All of the tests were negative. Id.

On February 7, 1985, the plaintiff began a week-long furlough. During that week, the plaintiff visited his prospective employer (where he has been employed since his release in November 1985 to the present, Tr. 11–12), to secure his work release. Tr. 16. This was important to the plaintiff, because with a secure job he would be transferred to a New York City facility to serve the last nine months of his sentence. In the work release program, the plaintiff "would leave the facility [for] the day, work, then come to the facility and sleep at night and [he] would be earning a salary and saving money for [his] release." Tr. 18. Plaintiff spent most of the rest of his time with his wife and daughter. Tr. 16. When he returned to Downstate on February 15, 1985, plaintiff reported to the offi-

---

2. The plaintiff testified that his wife and daughter had visited him while he was incarcerated at Auburn Correctional Facility. This occurred prior to plaintiff's move to Downstate. Plaintiff testified that as a result of the long bus trip they made, his daughter fell asleep in the visiting room and did not wake up until ten minutes before the visit ended. Plaintiff also stated that his wife was "half exhausted" from the trip. *See* Trial Transcript at 39 [hereinafter "Tr. x."]. This testimony appeared to be spontaneous and sincere. Because of this incident, the plaintiff told his wife not to make the long trip again.

3. The plaintiff testified that he did not recall the reason for this confinement. Tr. 40. He testified that he believed it had occurred in 1982. *See id.* The court takes judicial notice that the incident in question occurred in 1981, and was not connected to drug use. In fact, it appears that the plaintiff was disciplined for participating in a disturbance between another prisoner and a Corrections Officer. *See Pino v. Dalsheim,* 605 F.Supp. 1305, 1310 (S.D.N.Y. 1984). From the statement of the inmate who was at the center of the disturbance, it is plausible that the plaintiff intervened to keep the peace. *See id.* ("Pino explained [to an official involved in the disciplinary proceeding] that *his* argument with Officer Bowman was personal and at no time did he attempt to involve others.").

The plaintiff testified that he was never disciplined for drug use, except for the incident that forms the basis for this action. *See* Tr. 39.

cer in charge of processing him into the facility, Officer Knapp. Tr. 16–17.

Officer Knapp escorted the plaintiff to the prison clinic, to provide a urine sample for testing. Tr. 17. This did not surprise the plaintiff; the testing was "standard procedure." *Id.* At that time, the plaintiff was aware that inmates found guilty of having used drugs while on furlough were subjected to a "Tier III" hearing. Tr. 19. This was "the severest of the superintendent's proceedings," *id.; see id.* at 47 (testimony of the defendant) (Tier III hearing is "generally considered to deal with the more severe charges"), which might lead to special confinement, loss of certain privileges,[4] and possible transfer out of Downstate. Tr. 19.

Five days later, the plaintiff received a misbehavior report. It stated that the plaintiff's urine specimen had tested positive for drug use. Tr. 19–20. On receipt, the plaintiff was placed under "keep lock status."[5] Tr. 20.

On February 26, 1985, the defendant commenced the Tier III hearing.[6] The plaintiff pleaded not guilty. He asked that two corrections officers, with whom he had spent significant amounts of time while being processed on February fifteenth, testify on his behalf. They did. Both testified that the plaintiff did not appear to them to be under the influence of drugs while they processed him. *See* Joint Trial Exhibit 7 at 5 (Officer Knapp) [hereinafter "Ex. x."]; *id.* at 6 (Officer Ciangiola).

The plaintiff reviewed the report of the National Health Laboratory, Ex. 4, which indicated that marijuana was present in his urine. The plaintiff asked the defendant to read a stamped statement in the center of the single page report. *See* Ex. 7 at 3. That statement reads: "A positive cannabinoid result should be confirmed by an alternate method. If you wish further testing (at an additional charge) contact laboratory within 24 hrs." Ex. 4; *see* Ex. 7 at 3. The plaintiff asked whether a confirmatory test had been performed. When told there was no record of any confirmatory test, the plaintiff asked whether the test was conclusive. *See* Ex. 7 at 3. The defendant stated that he would make inquiry. *Id.*

The hearing was recessed; it resumed on March 5. The defendant stated that he had checked with other prison officials concerning the need for a confirmatory test. Ex. 7 at 8; *see* Tr. 72–74. Defendant explained to plaintiff that the confirmation was not intended to insure the correctness of the positive result, but rather to confirm the level of drugs present in the system. *See* Ex. 7 at 8.

The defendant held that the preponderance of evidence established plaintiff's violation of a rule or regulation prohibiting use of a narcotic or controlled substance. *See* Ex. 7 at 9–10. The defendant stated that "a clear chain of evidence" had been shown, *id.* at 10, and that "the chemical evidence on a reasonably valid test" proved that the plaintiff had ingested marijuana. *Id.* at 8–9. The defendant imposed a penalty of sixty days' confinement to cell[7] and loss of all privileges. *See* Ex. 7 at 9.

The plaintiff served fifteen days of this punishment in Downstate. Tr. 24. He then was transferred to Dannemora State Prison, also known as the Clinton Correctional Facility, Tr. 26, where he completed his punishment, and his sentence. *See* Tr. 24–26. This transfer was not ordered by

---

4.  *See* discussion *infra* at 11–12 & nn. 8–10.

5.  The plaintiff explained that he had to stay in his cell, was unable to continue his educational programs, and could not receive telephone calls. Tr. 20; *see Pino v. Dalsheim*, 605 F.Supp. 1305, 1309 n. 2 (S.D.N.Y.1984).

6.  The proceedings were recorded, and a transcript was made. The transcript is in evidence as Joint Trial Exhibit 7 [hereinafter "Ex. x."]. A copy of the transcript is incorporated into this Opinion as Appendix B.

7.  The parties disagree as to whether the plaintiff was placed in "solitary confinement." Although the plaintiff indisputably was forced to remain in his cell for twenty-three hours each day, *see* Tr. 24, 29, other inmates were being held in cells on both sides. *See id.* at 33–34. Plaintiff could not communicate with these other prisoners during this period. *See id.* at 34. However, he was allowed to have visitors. Tr. 81.

the defendant; he did not have the power to issue such an order. Tr. 77. Rather, it was explained that Downstate "is a reception center," having "a very small cadre of general population inmates." *See* Tr. 41. This cadre "is primarily composed of inmates who would be working at the facility." *Id.* at 42. An individual subject to confinement as a result of a Tier III proceeding is no longer qualified to be working, and therefore is transferred. *Id.*

The plaintiff also lost certain privileges as a result of the adjudication of guilt. These included telephone privileges,[8] commissary privileges,[9] and package privileges.[10] *See* Ex. 7 at 9. Further, when the plaintiff finished his period of confinement, on April 21, 1985, he was given the job of porter in a school, earning thirty cents per day.[11] Tr. 26.

The plaintiff told his wife not to visit him at Dannemora. He gave two reasons for this. First, his family could not afford the bus tickets. *See* Tr. 28. Second, plaintiff's daughter suffered from motion sickness. The bus trip, "18 hours, maybe 20 hours," *id.*, was too difficult.[12] Because of this, plaintiff did not see his family until he returned to New York City, in November 1985. Tr. 11–12, 28.

## FINDINGS OF FACT

1. In early 1985, the plaintiff earned $1.55 per day from his employment in Downstate. Tr. 13.

2. While on furlough in February 1985, the plaintiff confirmed employment, so that he might participate in a work release program. He was eligible for work release because he was in the final year of his prison term. Tr. 15–16.

3. The plaintiff knew, from prior experience, that he would be subjected to a urinalysis when he returned from furlough on February 15, 1985. Tr. 17.

4. The plaintiff did provide a urine sample on February 15, 1985, for urinalysis. Tr. 17–18.

5. The State of New York Department of Correctional Services issued a Directive, number 4937, on Urinalysis Testing, dated December 1, 1983. *See* Ex. 1. Directive 4937 includes a section entitled "Procedure." In the subsection entitled "Process [sic] the Urine Specimen," the Directive states that, whether the test is conducted at the facility, or at an independent laboratory, all persons handling the urine specimen must make an appropriate notation on a form entitled "Request for Urinalysis Test." *See* Ex. 1 at D(5)(a)(1); *id.* at D(5)(b)(1). Attached as Appendix A to the Directive is a copy of the form, called "Request For Urinalysis Test," or, "Form 2082."

6. The copy of Form 2082 that accompanied the plaintiff's urine specimen was introduced at the disciplinary hearing conducted by the defendant. Ex. 2. The Form indicates the following chain of custody:

From Inmate: Soto, Raul to R. Knapp, 2/15/85 at 10:15 a.m.

From R. Knapp to the Downstate Hospital Refrigerator, 2/15/85 at 10:25 a.m.

Form 2082 states, directly beneath the area for stating the chain of custody: "This form is to be filled out *completely*. It is to accompany the specimen until the specimen is tested." Ex. 2 (emphasis in original).

---

8. Prisoners are allowed to make two telephone calls a month to their families. *See* Tr. 25. A prisoner who loses the privilege is permitted to place a call in the event of an emergency. *See id.* at 81.

9. Prisoners may make purchases from the prison commissary of items such as soap, toothpaste, and cigarettes. *See* Tr. 25.

10. A prisoner's family can send, or bring on personal visits, two packages a month, equal to thirty-five pounds of food. *See* Tr. 25.

11. At one point, the plaintiff stated that he might have earned thirty-five cents per day, *see* Tr. at 35, but he said he received the starting salary. *See id.* Apparently, thirty cents per day is the pay given to prisoners who are unemployed or going to school. *See* Tr. at 36–37.

12. The plaintiff made this determination based on his family's prior experiences. *See supra* note 2.

7. The specimen was not to be tested at Downstate, even though Downstate possessed the necessary facilities. This was the normal procedure for specimens obtained from inmates returning from furloughs. Tr. 58–60.

8. A specimen, purportedly the plaintiff's, was delivered to the National Health Laboratories for analysis. National Health Laboratories used the EMIT test to conduct the analysis. The analysis was positive for marijuana. Ex. 4.

9. The National Health Laboratories report states in bold print, in the center of the page and just beneath the positive result: "A positive cannabinoid result should be confirmed by an alternate method. If you wish further testing (at an additional charge) contact laboratory within 24 hours." Ex. 4.

10. Downstate did not request or perform a confirmatory test on the urine sample. Tr. 93.

11. Based on the National Health Laboratories report, a Misbehavior Report was filed against the plaintiff. Ex. 3.

12. Another piece of documentary evidence introduced at the disciplinary proceeding was a document called "Downstate Correctional Facility—Urinalysis Check Sheet/Continuity Form" [hereinafter "Continuity Form"]. Ex. 6.[13] This form states that it is to

> accompany the urine specimen and continue the continuity to the final testing stage. Upon completion, it will be forwarded with a copy of Form 2082 (Request for Urinalysis) to the Tier III Disciplinary Office.

Ex. 6. This form "is a local Downstate Correctional Facility form." Tr. 97.

13. The Continuity Form contains a check list. The form states that all parts of the check list must be completed. The Continuity Form used in the disciplinary proceeding at issue states "Yes" in answer to "Chain of custody completed on Form 2082 starting from employee observing urination." Ex. 6. This answer is not true. See Ex. 2; Tr. 89–90. The Continuity Form

also lacks any response to another inquiry. See Ex. 6. Further, the Continuity Form states that the plaintiff's urine specimen was delivered to the prison laboratory on February 15, 1985. This is not consistent with the testimony at trial that the practice of officials at Downstate was not to process specimens taken from prisoners returning from furloughs at the prison laboratory. Tr. 58–60. Additionally, the defendant stated at trial that he had no evidence, in 1985, to indicate that Downstate's laboratory analyzed the plaintiff's urine sample. Tr. 58.

14. During the disciplinary proceeding, the defendant, for the record, read down the "Check List" and (untitled) "Chain of Custody" sections of the Continuity Form. Ex. 7 at 2. The defendant misidentified an employee of National Health Laboratories, Bob Lewis, calling him "R. Ludden." Id. The defendant skipped over one item that had not been completed, although the Continuity Form states that it had to be completed. See Ex. 6 & Ex. 7 at 2. The defendant also neglected to note that the specimen had been delivered to an outside laboratory. See Ex. 6 & Ex. 7 at 2. The defendant stated that the specimen had been "removed" to the prison laboratory, when the Continuity Form states that the specimen was "delivered" to the prison laboratory, where it was "received." See Ex. 6 & Ex. 7 at 2.

15. The defendant had never conducted a disciplinary proceeding before the one involving the plaintiff. Tr. 63.

16. On March 5, 1985, the plaintiff was adjudged guilty of using marijuana, based, substantively, solely on the chemical evidence provided by the report of National Health Laboratories. See Ex. 7 at 9; Ex. 5 ("Superintendent's Hearing Disposition Rendered").

17. The plaintiff was ordered confined to his cell for sixty days. Ordinarily, the plaintiff would be outside of his cell from 8 a.m. until 6 p.m., except for a "head count" at noon. Tr. 33. Punitive confinement consisted of confinement for 23 hours each

---

**13.** A copy of the Continuity Form is incorporated into this Opinion as Appendix A.

day. *Id.* The plaintiff lost his telephone, package, and commissary privileges because of the punishment. Ex. 7 at 9.

18. As a result of the adjudication of guilt, the plaintiff was transferred from Downstate to Dannemora. Tr. 24–26, 41–42, 77. The court takes judicial notice that Dannemora is located approximately twenty miles from the Canadian border, in northeast New York State.

19. Also as a result of the adjudication of guilt, the plaintiff was reassigned to work as a porter, earning 30 cents per day. Tr. 26.

20. Within ten days of his transfer to Dannemora, the plaintiff wrote to Governor Cuomo. While complaining that he had been found guilty unjustly, the purpose of the letter was to plead that the Governor intercede to have the plaintiff transferred to a facility closer to his family so that he might be able to visit with them. He made specific reference to, and stated that he was enclosing a copy of, the 1980 letter from the doctor at Columbia Presbyterian Medical Center regarding his youngest daughter, *see* discussion *supra* at 9–10, in the letter to Governor Cuomo. Complaint Ex. D2–D3.

21. On May 1, 1985, Commissioner Coughlin wrote to the plaintiff, stating that Governor Cuomo had referred the plaintiff's letter to him. The letter from Commissioner Coughlin states that "[d]ue to [the plaintiff's] disciplinary infraction and disposition [he] w[as] no longer appropriate for Downstate Cadre and w[as] transferred to the Clinton Correctional Facility." The letter goes on to state that the plaintiff's case would be reviewed "semi-annually" for transfer eligibility. The letter does not indicate how the decision was made to transfer the plaintiff to Dannemora, rather than another facility. Comp. Ex. D6.

22. The plaintiff wrote to Commissioner Coughlin in a letter dated May 7, 1985. He requested that he be considered a hardship case. He again referred to the 1980 letter regarding his retarded daughter, and asked: "When a doctor tells your department that they [sic] strongly recommend that I be kept close to New York City,

because of a retarded child who suffers from seizures what do you do? Where is the compassion or the human and individual element in your department?" Comp. Ex. D4.

23. In a letter dated May 8, 1985, the plaintiff wrote Governor Cuomo a second time. The plaintiff reiterated his complaint that it was not possible for his retarded daughter to make the trip to Dannemora. He asked the Governor to "give [his] family and [him]self a chance to stay close together." Comp. Ex. D5.

24. In a letter dated May 10, 1985, Commissioner Coughlin told the plaintiff that he was not eligible for transfer, and suggested the plaintiff discuss "future transfer prospects" with his assigned counselor. The letter did not indicate the reason for the plaintiff's transfer to Dannemora. Comp. Ex. D7.

25. No evidence independent of the Form 2082 and the Continuity Form was adduced at trial to demonstrate that the tested specimen did come from the plaintiff.

26. The plaintiff's testimony was wholly creditworthy.

27. The defendant was a grudging witness. His demeanor on the witness stand conveyed the impression that he was not confident that he had conducted the plaintiff's disciplinary proceeding in an error-free manner.

## CONCLUSIONS OF LAW

### *Liability*

I. Governing Legal Standards

The plaintiff states one alleged constitutional violation—absence of procedural due process—based on two separate failings: failure to confirm a positive urinalysis result and adjudication of guilt based on untrustworthy evidence. "In a procedural due process claim, it is not the deprivation of property or liberty that is unconstitutional; it is the deprivation of property or liberty *without due process of law*—without adequate procedures." *Daniels v. Williams*, 474 U.S. 327, 339, 106 S.Ct. 662, 679, 88 L.Ed.2d 662 (1986) (Stevens, J.,

concurring in judgment) (emphasis in original). "To resolve a procedural due process claim, a court must determine whether the plaintiff was deprived of a protected interest, and, if so, what process he was due." *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982)).

Unquestionably, New York State created, and the plaintiff possessed, a "liberty" interest in avoiding the disciplinary confinement he was subjected to as a result of the adjudication of guilt at issue. *See McCann v. Coughlin*, 698 F.2d 112, 121 (2d Cir.1983); *see also Frazier v. Coughlin*, 850 F.2d 129, 130 (2d Cir.1988) ("Disciplinary confinement clearly implicates a liberty interest requiring due process."); *Sher v. Coughlin*, 739 F.2d 77, 81 (2d Cir.1984) (same).[14]

To comport with "the minimum requirements of procedural due process," *Superintendent, Mass. Correctional Inst. at Walpole v. Hill*, 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974)), the defendant's determination, which resulted in the deprivation of the plaintiff's liberty interest, must be supported by "a modicum of evidence" in the record. *See id.* at 454–56, 105 S.Ct. at 2773–75. "The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." *Id.* at 456, 105 S.Ct. at 2774.[15]

The court recognizes that New York State could satisfy procedural due process by providing "a meaningful postdeprivation remedy, such as a tort suit." *Davidson v. Cannon*, 474 U.S. 344, 358, 106 S.Ct. 668, 675, 88 L.Ed.2d 677 (1986) (Blackmun, J., dissenting); *see Parratt v. Taylor*, 451 U.S. 527, 543–44, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Where a tort suit is precluded by state law, a section 1983 claim lies. *See Daniels*, 474 U.S. at 339, 106 S.Ct. at 679 (Stevens, J., concurring in judgment); *Davidson*, 474 U.S. at 358–59, 106 S.Ct. at 676 (Blackmun, J., dissenting); *Hudson v. Palmer*, 468 U.S. 517, 533–36, 104 S.Ct. 3194, 3203–05, 82 L.Ed.2d 393 (1984). Such is the case here.

Literally one week prior to trial, the New York Court of Appeals decided *Arteaga v. State*, 72 N.Y.2d 212, 527 N.E.2d 1194, 532 N.Y.S.2d 57 (1988). In *Arteaga*, the Court of Appeals held unanimously that "for purposes of common law tort actions in New York, prison hearing officers should be entitled to absolute immunity." *Id.*, dissent at 224, 527 N.E.2d 1194, 532 N.Y.S.2d 57 (Simons, J., dissenting).[16] A claim for fail-

---

**14.** Counsel for the defendant objected to the plaintiff's characterization of his confinement as "solitary confinement." *See* Tr. 33–34. The point is moot in the constitutional sense. "A prisoner who may be confined to his quarters or elsewhere for at least fourteen days ... has a right to the [procedural protections of the due process clause]." *McCann v. Coughlin*, 698 F.2d 112, 121 (2d Cir.1983).

**15.** In *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Supreme Court concluded "that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels*, 474 U.S. at 328, 106 S.Ct. at 663 (emphasis in original). The Court rejected the petitioner's argument that *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), held that a State is liable for negligence in failing to comply with procedural due process before depriving an in-

mate of good-time credit. The Court stated that "the relevant action of the prison officials in that situation is their deliberate decision to deprive the inmate of good-time credit, not their hypothetically negligent failure to accord him the procedural protections of the Due Process Clause." *Daniels*, 474 U.S. at 333–34, 106 S.Ct. at 666; *see Franklin v. Aycock*, 795 F.2d 1253, 1261–62 (6th Cir.1986). So, too, in this lawsuit liability, if it exists, is predicated on the defendant's intentional decision to mete out punishment against the plaintiff.

**16.** The Court of Appeals split 4–3 on a point not relevant to this action. *See Arteaga v. State*, 72 N.Y. 212, 221, 527 N.E.2d 1194, 532 N.Y.S.2d 57 (1988) (Simons, J., dissenting) ("Although I agree that the hearing officers are entitled to absolute immunity for common law torts, I do not agree that the corrections officers who investigate inmate misbehavior and institute disci-

ure to provide procedural due process lies under section 1983 when the plaintiff would be precluded from recovering under state law due to sovereign immunity. *See Davidson*, 474 U.S. at 358–59, 106 S.Ct. at 676 (Blackmun, J., dissenting); *Hudson*, 468 U.S. at 535–36, 104 S.Ct. at 3204–05; *see also Arteaga*, at 220–21, 527 N.E.2d 1194, 532 N.Y.S.2d 57 (noting that the inmate-plaintiffs were not without a remedy, as they could bring section 1983 actions if their constitutional rights had been violated); *id.*, dissent at 224–25, 527 N.E.2d 1194, 532 N.Y.S.2d 57 (Simons, J., dissenting) (same).

State law immunizing government conduct otherwise subject to suit under section 1983 is preempted, "because the application of the state immunity law would thwart the congressional remedy, which of course already provides certain immunities for state officials." *Felder v. Casey*, — U.S. —, —, 108 S.Ct. 2302, 2307, 101 L.Ed.2d 123 (1988) (dictum) (citation omitted); *see Martinez v. California*, 444 U.S. 277, 284 & n. 8, 100 S.Ct. 553, 558 & n. 8, 62 L.Ed.2d 481 (1980). In *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), the Supreme Court squarely addressed the issue whether prison disciplinary officers were entitled to absolute, or qualified, immunity for actions violative of the United States Constitution. *See id.* at 194, 106 S.Ct. at 497.[17] The Court held that, under the United States Constitution, prison authorities conducting disciplinary hearings are entitled only to qualified immunity for

their official acts. *See id.* at 206, 106 S.Ct. at 503.

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, — U.S. —, —, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

> [T]he right the official is alleged to have violated must have been "clearly established" in a ... particularized ... sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id.* at —, 107 S.Ct. at 3039 (citation omitted); *see Giacalone v. Abrams*, 850 F.2d 79, 85 (2d Cir.1988).

## II. Application to the Facts

### A. Failure to Confirm Positive Test Results

Assuming without deciding that as a constitutional rule reliance on an unconfirmed[18] EMIT test violates due process,

---

plinary proceeding [sic] by preparing and filing misconduct reports are similarly immune.").

**17.** *Cleavinger v. Saxner* was an action brought against federal prison authorities, under the rule established in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See Cleavinger*, 474 U.S. at 198, 106 S.Ct. at 499. The rule of *Cleavinger* is applicable to this section 1983 action against state prison authorities, because the Supreme Court has refused "to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed. 2d 895 (1978); *see id.* at 496–504, 98 S.Ct. at 2905–09; *see also McCabe v. Arave*, 626 F.Supp. 1199, 1207 (D.Idaho 1986) (applying *Cleavinger*

to section 1983 action), *aff'd in part, rev'd in part on other grounds, vacated in part on other grounds*, 827 F.2d 634 (9th Cir.1987).

**18.** It is important to specify what is meant by "unconfirmed." In this case, at the time of plaintiff's disciplinary hearing, Directive 4937 mandated that two tests, using the same testing method, be conducted only when the testing was conducted in the facility's own laboratory. *Compare* Ex. 1 at D(5)(a)(4) *with id.* at D(5)(b)(2)–(3). In his opening statement, counsel for the defendant explained the reasoning behind this policy:

> You have inexperienced or only slightly trained Corrections personnel conducting this highly technical scientific test; thus requiring two administrations of that test. And you have a reasonable basis for expecting that a professional laboratory would have legitimate

the defendant is entitled to qualified immunity unless that rule was "clearly established" in March 1985. Plaintiff points to several decisions [19] holding that use of an unconfirmed urinalysis test result violates due process. Only one case cited by the plaintiff was decided prior to 1985, and another was decided less than one month prior to the termination of plaintiff's disciplinary hearing. *See supra* note 19.

On the other hand, defendant points to two cases, including one decided by a New York state court, decided prior to 1985 holding use of an unconfirmed EMIT test constitutional. *See Jensen v. Lick,* 589 F.Supp. 35, 38–39 (D.N.D.1984); *Orr v. Kuhlman,* No. 46, slip op. (N.Y. Co. Ct. Oct. 19, 1984), *cited in Peranzo v. Coughlin,* 608 F.Supp. 1504, 1512–13 (S.D.N.Y. 1985).

In light of the decisions cited by the defendant, the court concludes that the law requiring use of a confirmatory test before accepting EMIT test results as reliable evidence was not "clearly established" at the time the defendant conducted the plaintiff's hearing. Therefore, the defendant is entitled to immunity for the act of receiving the test results as evidence despite the absence of a confirmatory test.

## B. Failure to Establish a Chain of Custody [20]

The plaintiff also objects that the defendant did not establish a proper foundation for reception of the EMIT test results, *i.e.,* that no chain of custody was established. The defendant admitted that plaintiff's disciplinary hearing was the first of its kind that he had ever conducted.[21] Further, the defendant admitted that he had not "been trained in what is a complete chain of custody." Tr. 89.

The official Department of Correctional Services Form, 2082, recorded and filed in the case of inmate Soto is obviously incomplete. It states only that the plaintiff gave his specimen to Officer Knapp and that Officer Knapp placed the specimen in the refrigerator. The Form is silent on how and when the specimen left the refrigerator, was transmitted to the laboratory, was tested, labeled, and returned to the Corrections Department. The defendant,

---

personnel working on the procedures and you might expect to have confidence in a positive finding from their analysis.
Tr. 10.

This case, involving a *single* EMIT test, is distinguishable from those upholding use of EMIT tests that are "unconfirmed" in the sense that they are not subjected to an alternative confirming method, such as gas chromatography-mass spectrometry. *See Peranzo v. Coughlin,* 608 F.Supp. 1504, 1512–15 & n. 16 (S.D.N.Y. 1985) (preliminary injunction); *Peranzo v. Coughlin,* 675 F.Supp. 102, 103–05 (S.D.N.Y. 1987) (summary judgment), *aff'd per curiam,* 850 F.2d 125 (2d Cir.1988). In *Peranzo,* the court held that *double* EMIT testing was sufficiently reliable that the use of test results as evidence in disciplinary proceedings does not offend due process. *See Peranzo,* 675 F.Supp. at 105; *accord, Lahey v. Kelly,* 71 N.Y.2d 135, 142–43, 518 N.E.2d 924, 927–28, 524 N.Y.S.2d 30, 33–34 (1987) (distinguishing cases holding that single unconfirmed test are not sufficiently reliable to satisfy due process).

**19.** Plaintiff cites *Jones v. McKenzie,* 628 F.Supp. 1500, 1505–07 (D.D.C.1986), *rev'd on other grounds, vacated on other grounds,* 833 F.2d 335 (D.C. Cir.1987); *Higgs v. Wilson,* 616 F.Supp. 226, 230–33 (W.D.Ky.1985), *vacated mem. sub nom. Higgs v. Bland,* 793 F.2d 1291 (6th Cir. 1986); *Kane v. Fair,* 33 Crim.L.Rep. (BNA) 2492,

2492 (Mass.Super.Ct. Aug. 5, 1983); *Johnson v. Walton,* No. 561–84 Rm (Vt.Super.Ct. Feb. 14, 1985). *See* Plaintiff's Revised Trial Memorandum at 8.

**20.** The chain of custody requirement, commonly found in contraband cases and litigation in which scientific analysis is relevant, mandates a continuous, physical nexus between the source of the substance in issue, the testing or analytical process to which the substance is subjected, and the proponent of the substance as real evidence.

**21.** The following colloquy occurred:
THE COURT: Had you conducted disciplinary hearings of a similar nature prior to Mr. Soto's, that is a case where an inmate had been on a furlough and that on return his urine had been tested positive for some controlled substance?
THE WITNESS: I don't believe so.
THE COURT: You never had a hearing of this type before Mr. Soto?
THE WITNESS: Not at Downstate, not in this period of time.
THE COURT: Did you ever have a hearing of this particular character at any time?
THE WITNESS: I don't believe so.
Tr. 63.

however, maintains that he relied on a separate, secondary "Continuity Form" to establish the chain of custody. The transcript of the hearing indicates that the defendant made a cursory review of that form. *See* Ex. 7 at 2.

An even casual review of the Continuity Form reveals that it is inaccurate and incomplete. It is inaccurate in that it states that the chain of custody on Form 2082 is complete. *See* Ex. 6. It is incomplete in that another section of the "Check List," which the instructions for filing the Continuity Form require to be answered, is left unanswered. *See id.*

The Continuity Form also notes that one Bob Lewis, who picked up the specimen "as a representative of National Health Lab[oratorie]s," Tr. 71, and who presumably delivered the specimen to National Health Laboratories, *see* Tr. 98, also delivered the plaintiff's specimen to the prison laboratory, where it was received. Ex. 7 at 2; *see* Ex. 6. The defendant misidentified Mr. Lewis, indicating that he did not know, in 1985, who the individual was.[22] More importantly, there is no indication that the defendant even paused to ask why an employee of National Health Laboratories would be delivering specimens to the prison laboratory, or what happened to the specimen after it was received by the prison laboratory.[23] *See* Ex. 7 at 2. Because it was the practice, if not the policy, of Downstate to send the specimens of prisoners returning from furloughs to National Health Laboratories for testing, *see* Tr. 59–60, this delivery appears to have been irregular, superfluous, and unnecessary. Yet, the defendant did not question this entry. In fact, the defendant, in reading the Continuity Form into the record, changed the word "delivered" on the Continuity Form to "removed." *See* Ex. 6 & Ex. 7 at 2. This represents an intentional alteration by the defendant of the principal document upon which he seeks to rely in order to justify his establishment of the crucial,

indeed, decisive chain of custody requirement upon which the punishment of the plaintiff turned. The defendant also neglected to indicate that the specimen had indeed been received in the prison laboratory, and made no inquiry as to who there had received it, and under what circumstances. *See* Ex. 6 & Ex. 7 at 2.

Despite these glaring deficiencies in the documentation, the defendant concluded that "a clear chain of evidence" existed. Ex. 7 at 10. He relied on Form 2082 and "primarily," Tr. 69, the Continuity Form. *See id.*

> *Wolff* certainly requires that the handling and processing of ... inmate [urine] samples be done in such a way as to insure the basic integrity of the system. An inmate has a legitimate liberty interest in this subject matter and has a right to expect minimal due process safeguards to insure that samples are not mishandled by correctional officers. Given the realities of the correctional setting, these procedures must be reasonably definite and must be fully and carefully documented at all stages. Such procedures serve the best interests of the correctional system as well as the limited due process rights of the inmate.

*Wykoff v. Resig*, 613 F.Supp. 1504, 1513 (N.D.Ind.1985). Although "technical rules of evidence do not apply in prison disciplinary proceedings," *Price v. Coughlin*, 116 A.D.2d 898, 899, 498 N.Y.S.2d 209, 210 (3d Dep't 1986) (mem.), *appeal withdrawn*, 69 N.Y.2d 743, 504 N.E.2d 700, 512 N.Y.S.2d 1032 (1987) (mem.); *see Wolff*, 418 U.S. at 566–68, 94 S.Ct. at 2979–81 (under certain circumstances, prison officials not required to afford prisoners rights of confrontation and cross-examination at disciplinary hearings); *Helms v. Hewitt*, 655 F.2d 487, 501–03 (3d Cir.1981) (subject to certain conditions meant to afford prisoner minimum due process, prison authorities may base determination on testimony by unidentified informant), *rev'd on other grounds*, 459

---

**22.** The defendant testified that he *knows* who Bob Lewis is. Tr. 98. He did not testify that he *knew* Bob Lewis at the time of the plaintiff's hearing. *See id.*

**23.** The defendant testified that he did not know, at the time he testified at trial, whether the plaintiff's specimen had been tested in Downstate's laboratory in 1985. *See* Tr. 58.

U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), nevertheless "the basic integrity of the system" must be insured. *Wykoff,* 613 F.Supp. at 1513.

Under ordinary circumstances, even assuming that failure to follow Directive 4937, requiring that a complete chain of custody appear on Form 2082, is a violation of state law, resort to the Continuity Form to complete the chain of custody could satisfy the due process clause. *See Davis v. Scherer,* 468 U.S. 183, 192–93, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984); *Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985). That finding, however, requires a determination that the Continuity Form possesses sufficient regularity that there is some assurance that the test results are creditworthy. *Cf. Helms,* 655 F.2d at 502–03 (hearsay evidence accepted in prison disciplinary proceeding is probative of the prisoner's guilt only if the record contains facts establishing some indicia of reliability); *Harris v. Coughlin,* 116 A.D.2d 896, 897, 498 N.Y. S.2d 276, 277 (3d Dep't) (mem.) (same), *appeal dismissed mem.,* 67 N.Y.2d 1047, 495 N.E.2d 355, 504 N.Y.S.2d 91 (1986).

■ The court concludes that the Continuity Form as executed in this case is not creditworthy. The fact that the response to the first query on the "Check List," the chain of custody on Form 2082, is false, the fact that another query is left unanswered, and the fact that the plaintiff's specimen may have been delivered to the prison laboratory combine to fatally undermine the credibility of the document. This is not merely a case where there are some "possi-

ble discrepancies as to the times the specimen was removed from the refrigerator and the time[ ] the test[ ] w[as] performed." *See Price,* 116 A.D.2d at 899, 498 N.Y.S.2d at 210.

■ By March 1985, the law was "clearly established" that minimum due process required a prison disciplinary body to establish a reasonably reliable chain of custody as a foundation for introducing the results of urinalysis tests. Directive 4937 represents recognition of this requirement. The defendant is entitled to qualified immunity only if his conduct in accepting the Continuity Form as creditworthy and probative was "objective[ly] legal[ly] reasonable[ ]."

The defendant's claimed reliance on the Continuity Form is not objectively legally reasonable. First, that form indicated to the defendant that it was not necessary to resort to it to establish the chain of custody, since by its own terms, it asserted that the primary document, Form 2082, was complete. The defendant noted this assertion in the hearing. *See* Ex. 7 at 2. To accept the defendant's trial testimony, that he used the Continuity Form to complete the obviously incomplete chain of custody on Form 2082, it is necessary to conclude that he ignored this assertion.[24] Second, the form was blank in an area which was required to be completed. The defendant skipped this area when he reviewed the form for the record during the hearing. *See* Ex. 7 at 2. This was the first item that the defendant skipped over, having read all the items above it. *See* Ex. 7 at 2. Third, the form indicates that the plaintiff's specimen was delivered to Downstate's laboratory. The defendant noted this at the

---

24. The defendant's explanation for his acceptance of this assertion was that the assertion on the Continuity Form "was correct for that employee and for that specimen for that period of time." Tr. 89. "[T]hat employee" is not identified. Based on Exhibit 2, the defendant's reference must have been to Officer Knapp.

This explanation is not tenable. Immediately beneath the chain of custody inquiry, the Continuity Form asks whether the "[t]est [was] conducted in facility hospital, clinic or other appropriate area." Ex. 6. ("*Was* conducted," rather than "*will be conducted,*" is the only correct

interpretation; otherwise, the item would not be part of a check list.) The two "Yes" responses to these inquiries were made by the same person. If Officer Knapp wrote "Yes," that the chain of custody was "complete" through the time the specimen was placed in the refrigerator, he could not have written "Yes" to whether the test had been conducted, because it had not yet been conducted. It is not plausible that the same person would have answered these two inquiries at different times. That would defeat the very purpose of a check list.

hearing, while misidentifying Bob Lewis. *See id.* The defendant also changed "delivered," which appears on the Continuity Form, to "removed." *See* Ex. 6 & Ex. 7 at 2. The defendant then skipped the final entry on the Continuity Form, that Bob Lewis "sent" the specimen to an outside laboratory.

The transcript of the hearing, Exhibit 7, indicates that the defendant did not attempt to reconcile the inconsistencies on the Continuity Form. The transcript indicates, at best, that the defendant skimmed over them, paying them little attention. In fact, the defendant referred to every item on the Continuity Form except two that obviously are problematic. He also changed the wording of one entry. The court infers that this was done intentionally to reduce the chance that it might become problematic. This was not reasonable. Nor was the defendant's failure to inquire why the Continuity Form indicates that the plaintiff's specimen was delivered to the prison laboratory, or what happened to it after this delivery.

█ In conclusion, the defendant failed to act in an objectively legally reasonable manner to protect the plaintiff's clearly established due process right that the evidence against him have a sufficient foundation.[25] The defendant is not entitled to qualified immunity for his actions in conducting the plaintiff's disciplinary hearing. Therefore, he is liable for violating the plaintiff's federal constitutional right to be accorded procedural due process under the fourteenth amendment.

*Damages*

I. Governing Legal Standards

The Supreme Court has stated on more than one occasion that 42 U.S.C. section 1983 creates " 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution." *Carey v.*

*Piphus,* 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 996, 47 L.Ed.2d 128 (1976) & 42 U.S.C. § 1983), *quoted in Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 305–06, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986). "Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Stachura,* 477 U.S. at 306, 106 S.Ct. at 2542. Thus, "damage awards under § 1983 should be governed by the principle of compensation." *Carey,* 435 U.S. at 257, 98 S.Ct. at 1049; *see id.* at 254–57, 98 S.Ct. at 1047–49; *Stachura,* 477 U.S. at 306–07, 106 S.Ct. at 2542–43.

"[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.' " *Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974) (ellipsis in original)). A plaintiff may recover for "distress," defined as "mental suffering or emotional anguish." *See Carey,* 435 U.S. at 260–64 & n. 20, 98 S.Ct. at 1050–53 & n. 20.

To recover actual damages for distress, the plaintiff must prove that such injury actually was caused by the deprivation of due process. *See Carey,* 435 U.S. at 262–64, 98 S.Ct. at 1051–52. The plaintiff is not entitled to recover for distress created by a justified deprivation of an interest protected by the Constitution. *See. id.* at 263, 98 S.Ct. at 1052. If the plaintiff is unable to prove actual injury, he is "entitled to recover nominal damages not to exceed one dollar." *See id.* at 254–57, 98 S.Ct. at 1047–49; *id.* at 266–67, 98 S.Ct. at 1053–54; *Powell v. Ward,* 643 F.2d 924, 934 (2d Cir.) (per curiam), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981).

**25.** The court does not conclude or imply that the defendant acted maliciously. Rather, in light of the fact that the defendant had never conducted such a hearing before, and was not knowledgeable about the requirement of a prop-er foundation for the reception of evidence, the defendant acted only to intentionally ignore what he perceived as irregularities, so that the hearing could proceed without disruption.

Once the plaintiff has proven that he suffered actual injuries, the defendant may prove that the constitutional deprivation did not cause the injuries. The defendant bears the burden of proof to show that the deprivation did not cause the plaintiff's injuries. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977); *Franklin v. Aycock,* 795 F.2d 1253, 1263 (6th Cir.1986); *Kendall v. Board of Educ.,* 627 F.2d 1, 6 n. 6 (6th Cir.1980). The defendant can meet this burden by proving that the same result would have been reached absent the due process violation. *See Carey,* 435 U.S. at 260, 98 S.Ct. at 1050; *Kendall,* 627 F.2d at 6 & n. 6; *see also Wheeler v. Mental Health & Mental Retardation Auth.,* 752 F.2d 1063, 1071 (5th Cir.) ("back pay is not recoverable when the employer can show that the discharge would still have occurred absent procedural [due process] defects"), *cert. denied,* 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985); *Burt v. Abel,* 585 F.2d 613, 616 (4th Cir.1978) (since plaintiff's discharge was justified, on remand plaintiff would be precluded from alleging as damages from procedural deprivation lost pay or lost retirement-fund contributions). If the defendant can meet his burden, then the plaintiff can recover only nominal damages for his actual injuries. *See Carey,* 435 U.S. at 267, 98 S.Ct. at 1054; *Stein v. Board of New York,* 792 F.2d 13, 18–19 (2d Cir.) (reversible error not to instruct jury to award only nominal damages if jury finds complainant would have been discharged even if he had received procedural due process), *cert. denied,* 479 U.S. 984, 107 S.Ct. 572, 93 L.Ed.2d 576 (1986).

The foregoing rule applies to all injuries *except* distress. The plaintiff may recover for his distress caused by the failure to be accorded due process even if the defendant proves that other injuries the plaintiff claims are not caused by the failure of the defendant to accord the plaintiff due process. *See Carey,* 435 U.S. at 264, 98 S.Ct. at 1052 ("mental and emotional distress caused by the denial of due process itself is compensable under § 1983"); *Wheeler,* 752 F.2d at 1072 ("Irrespective whether [the plaintiff] would have been discharged ... absent procedural defects, she may recover for mental or emotional distress *flowing from the loss of her procedural rights.*") (emphasis in original); *Burt,* 585 F.2d at 616 (holding that although on remand the plaintiff will not be allowed to allege and prove pecuniary injuries and resulting damages, she may allege distress and resulting damages) (quoting *Carey,* 435 U.S. at 261, 98 S.Ct. at 1051).

Finally, punitive damages may be awarded in an action under section 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.... [T]his threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *see Bradley v. Coughlin,* 671 F.2d 686, 690 (2d Cir.1982).

## II. Application to the Facts

### A. Punitive Confinement

In *Sostre v. Rockefeller,* 312 F.Supp. 863 (S.D.N.Y.1970), *aff'd in part, modified on other grounds in part, rev'd on other grounds in part sub nom. Sostre v. McGinnis,* 442 F.2d 178 (2d Cir.1971) (en banc), *cert. denied,* 404 U.S. 1049, 405 U.S. 978, 92 S.Ct. 719, 1190, 30 L.Ed.2d 740, 31 L.Ed.2d 254 (1972), the district court awarded the plaintiff who had been denied procedural due process a per diem figure for time spent in "punitive segregation," *see* 442 F.2d at 182–83, taking into account various factors. *See Sostre,* 312 F.Supp. at 885. The Second Circuit stated in dictum that the amount awarded, $25.00 per day, "is not unreasonable." 442 F.2d at 205 n. 52.[26] Other courts have elected to follow the approach of *Sostre. See, e.g., Adams*

---

**26.** The statement is dictum because the defendant against whom a money judgment could be assessed had died, and no application to substitute a party who could be held responsible had been made to the district court. *See Sostre,* 442 F.2d at 205.

*v. Wolff,* 624 F.Supp. 1036, 1040–41 (D.Nev. 1985) ($40.00 per day); *Pino v. Dalsheim,* 605 F.Supp. 1305, 1319 (S.D.N.Y.1984) ($25.00 per day); *Pitts v. Kee,* 511 F.Supp. 497, 504 (D.Del.1981) ($30.00 per day); *Taylor v. Clement,* 433 F.Supp. 585, 589 (S.D. N.Y.1977) ($25.00 per day); *United States ex rel. Neal v. Wolfe,* 346 F.Supp. 569, 576 (E.D.Pa.1972) ($25.00 per day). This court adopts this approach.

Some of the factors the district court considered in *Sostre* are present here. Those factors are: loss of work opportunities, loss of money which might have been earned by working, and loss of schooling opportunities. The court also considers the duration of the confinement and the conditions of the confinement. *See Adams,* 624 F.Supp. at 1041.

■ The sixty days' confinement imposed on the plaintiff is longer than that imposed in every one of the cases already cited except *Sostre* itself. *See Adams,* 624 F.Supp. at 1041 (five days); *Pino,* 605 F.Supp. at 1319 (forty-five days); *Pitts,* 511 F.Supp. at 504 (six days); *Taylor,* 433 F.Supp. at 589 (thirty days); *Sostre,* 312 F.Supp. at 885 (three hundred seventy-two days). Further, unlike Sostre, the plaintiff in this action was prohibited from communicating with other prisoners while in punitive confinement. *See supra* note 7. *Compare Sostre,* 442 F.2d at 185 (explaining that Sostre did communicate with other prisoners) *with* Tr. 33–34 (the plaintiff was not allowed to have contact with other prisoners in his immediate area). On the other hand, the plaintiff was not held naked, nor was he without bedding. *See O'Connor v. Keller,* 510 F.Supp. 1359, 1372, 1375 (D.Md. 1981) (awarding prisoner $100.00 per day for time held in isolation without mattress, blanket, toilet paper, or, for part of the time, clothing). Taking these factors into consideration, the court determines that the plaintiff shall be awarded fifty ($50) dollars per day of punitive confinement, for a total of three thousand dollars.[27]

### B. Other Pecuniary Damages

■ As a direct result of the disciplinary action, the plaintiff was reassigned to a different job. His pay was cut from $1.55 per day to $0.30 per day. *See supra* findings of fact 1, 19. "Lost prison wages are ascertainable and recoverable [in a section 1983 action]." *Bradley v. Coughlin,* 671 F.2d at 690; *see Wolfe,* 346 F.Supp. at 576 (awarding lost wages from change in job status upon release from solitary confinement). The plaintiff was released from punitive segregation on April 21, 1985. *See* Ex. 7 at 9. He was released from prison in November, 1985. Because no exact release date was provided to the court, the court awards these damages for the period of April 21, 1985 to November 1, 1985, a period of one hundred ninety-four days. The plaintiff is awarded two hundred forty-two dollars and fifty cents (194 x $1.25) ($242.50) for lost wages.

As stated previously, the defendant can avoid liability for these pecuniary damages by demonstrating that the plaintiff would have been found guilty even if he had been accorded procedural due process. *See* discussion *supra* at 21. However, the defendant failed to present evidence at the trial that would verify independently the chain of custody for the plaintiff's urine specimen to the National Health Laboratories. *See supra* finding of fact 25. Therefore, the defendant is liable for the pecuniary damages flowing from the punitive segregation and from the plaintiff's lost wages.

### C. Distress

■ There remains the matter of distress damages. The court distinguishes distress flowing from the fact of punitive segregation from distress flowing from the plaintiff's transfer to Dannemora. No evidence was presented to indicate that the plaintiff suffered distress from his disciplinary confinement. Therefore, the plaintiff is entitled only to nominal damages, in the amount of one dollar, for the distress suf-

---

27. For the sake of clarity, this figure includes wages the plaintiff lost during the sixty-day period of confinement. The figure does not take into account any distress caused by the wrongful confinement. That issue is addressed *infra* in the text, at section C.

fered during the period of punitive segregation. *See Carey*, 435 U.S. at 262–64, 266–67, 98 S.Ct. at 1051–52, 1053–54; *Maldonado Santiago v. Velazquez Garcia*, 821 F.2d 822, 829 (1st Cir.1987).

As for distress flowing from the plaintiff's transfer, the court has no doubt that the plaintiff suffered mental anguish at being transferred to a prison that made it impossible for his wife and youngest child to continue to visit him, as they had been doing almost once per week. *See* Tr. 14–15. The letters to Governor Cuomo and Commissioner Coughlin, *see supra* findings of fact 20–24,[28] provide sufficient evidence that the court may infer mental anguish.[29]

Nevertheless, the court concludes that the defendant is not liable for this injury. The defendant testified that he neither ordered that the plaintiff be transferred to another facility from Downstate, nor had the power to issue such an order. *See* Tr. 77. More importantly, there was no evidence presented that the plaintiff *necessarily* would be transferred to Dannemora, or even a similarly inconvenient, in terms of his family's ability to visit the plaintiff, facility. The plaintiff's May 7, 1985 letter

to Commissioner Coughlin indicates that there are at least two facilities the plaintiff could have been transferred to in which he could have continued to receive visits from family members. *See* Comp. Ex. D4. Thus, the transfer to Dannemora was not inevitable.

■ The court has considered the factors contained in section 435 B of the Restatement (Second) of Torts (1965).[30] The defendant did not act with malevolent intent to punish the plaintiff. *See supra* note 25. Further, the unintended harm is hardly foreseeable, even assuming the defendant was aware of the plaintiff's unique personal circumstances, because the plaintiff could have been transferred to another facility that would have been close enough to New York City to allow his family to continue to visit him. Lastly, the intended harm, while serious, is not on a par with defamation, *see Carey*, 435 U.S. at 262–264, 98 S.Ct. at 1051–52 (plaintiff must prove actual distress flowing from procedural due process violation, whereas defamation distress damages are presumed), or assault. *See* Restatement (Second) of Torts § 435 B illustration 1 (actor who intention-

28. The letters, exhibits to the plaintiff's *pro se* complaint, were properly before the court for consideration. A pleading "is deemed to include any document attached to it as an exhibit." *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985); *see* Fed.R.Civ.P. 10(c). The defendants (the damage claims against the other defendants were later dismissed by the late Hon. Edward Weinfeld, *see Soto v. Coughlin*, 666 F.Supp. 634 (S.D.N.Y.1987)) answered the complaint by alleging that they "[d]en[ied] or lack[ed] knowledge sufficient to form an opinion as to the truth of each and every allegation contained in the complaint," Answer para. 1, except that they admitted they were employed by the New York State Department of Correctional Services. *See id.*

A party ... may not deny sufficient information or knowledge with impunity, but is subject to the requirements of honesty in pleading. An averment will be deemed admitted when the matter is obviously one as to which [the] defendant has knowledge or information.

*David v. Crompton & Knowles Corp.*, 58 F.R.D. 444, 446 (E.D.Pa.1973) (citation omitted). Here, the defendants failed to undertake even a minimal examination of their files to determine whether the letters were authentic. All the letters indicate that copies were placed in the

plaintiff's file. Under these circumstances, the existence and contents of the letters are deemed admitted by the defendants. *See Greenbaum v. United States*, 360 F.Supp. 784, 787–88 (E.D.Pa. 1973) (due to defendant's failure to examine its own files containing relevant information, defendant deemed to have admitted facts about which it had information).

29. Intangible injuries can be inferred from the circumstances, or established by the testimony. *See Seaton v. Sky Realty Co.*, 491 F.2d 634, 636 (7th Cir.1974); *Nichelson v. Quaker Oats Co.*, 573 F.Supp. 1209, 1231 (W.D.Tenn.1983), *rev'd on other grounds*, 752 F.2d 1153 (6th Cir.), *vacated*, 472 U.S. 1004, 105 S.Ct. 2696, 86 L.Ed.2d 713 (1985); *see also Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 1052 n. 20, 55 L.Ed.2d 252 (1978) (genuine mental distress "may be evidenced by one's conduct").

30. That section reads:

Where a person has intentionally invaded the legally protected interests of another, his intention to commit an invasion, the degree of his moral wrong in acting, and the seriousness of the harm which he intended are important factors in determining whether he is liable for resulting unintended harm.

Restatement (Second) of Torts § 435 B (1965).

ally hits victim over head *may* be held liable for serious harm to victim from administration of poison, instead of medicine, at hospital). Therefore, no damages are awarded for the plaintiff's regrettable distress flowing from the separation from his family. The chain of causation is too attenuated to hold the defendant responsible. No damages, either nominal or actual, are warranted.

### D. Punitive Damages

■■■ Finally, punitive damages are not merited in this action. The defendant did not exhibit a "reckless or callous disregard for the plaintiff's rights," *Smith*, 461 U.S. at 51, 103 S.Ct. at 1637, or "actual intent to injure or evil motive." *Id.* at 48, 103 S.Ct. at 1636.

■■■ In his complaint, the plaintiff also sought mandatory injunctive relief, requesting that the court expunge this adjudication of guilt from his prison record. It is the court's understanding that "[a]n inmate's disciplinary file is used collaterally by prison authorities in making other decisions concerning the nature and length of the inmate's confinement." *Pino*, 605 F.Supp. at 1319; *see Powell v. Ward*, 487 F.Supp. 917, 935 & n. 16 (S.D.N.Y.1980), *aff'd per curiam*, 643 F.2d 924 (2d Cir.), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). If such records are used only during the course of the confinement in which the violation occurs, there is no need for injunctive relief here. The plaintiff has finished his sentence; he is a free man. The issue appears to be moot. If there are other collateral consequences that may attach, or have attached, from the disciplinary record, the plaintiff is granted leave to move, on notice, to renew the request for injunctive relief.

### CONCLUSION

Judgment will be entered for the plaintiff against the defendant Lord, in his individual and official capacity, in the amount of $3,243.50 ($3,000.00 for punitive segregation plus $242.50 for lost wages plus $1.00 nominal damages for distress caused by the punitive segregation). Plaintiff's counsel are directed to serve and file a proposed Judgment in accordance with the terms of this Opinion and Order within seven days from the date this Opinion and Order is filed with the Clerk of the Court, providing five days' notice to the defendant.

In addition, plaintiff's counsel should submit their application for an award of attorneys' fees pursuant to 42 U.S.C. section 1988 no later than three weeks following the entry of Judgment. Defendants will have two weeks to respond to any such application. Plaintiff will have one additional week to reply. The court will determine whether an award of fees is warranted and the amount of any such award on the basis of those papers unless it becomes apparent that an evidentiary hearing is necessary.

SO ORDERED.

### APPENDIX A

DOWNSTATE CORRECTIONAL FACILITY

URINALYSIS CHECK SHEET/CONTINUITY FORM

This form will accompany the urine specimen and continue the continuity to the final testing stage. Upon completion, it will be forwarded with a copy of Form 2082 (Request for Urinalysis) to the Tier III Disciplinary Office.

Inmate's name: Soto R.    No. 98 A 4144    Cell 4 D 2 1

Requesting Supervisor: Name O M    Rank A    Date 2/15/95

Uniformed employee supervising the obtaining of specimen:

Signature R. Knepp    Rank C.O.    Date 2/15/95

Check appropriate boxes:

1. Was inmate read the following: "You have been ordered to submit a urine specimen for urinalysis testing and have been informed of the underlying reason (i.e., suspicion, routine, random) for the conducting of this test. Refusal to submit to the test constitutes a violation of facility rules and will be charged with 106.10 (All of facility personnel will be obeyed promptly and without argument, and may incur the same disciplinary disposition that a positive urinalysis result could have supported. If you are unable to provide a sample at this time, you will be detained and required to produce an adequate sample within three hours. You will be given only one opportunity to provide a sample."    **YES**    **NO**

2. Was inmate asked if he has taken medication recently – (Mandatory – indicate on Form 2082)

3. Did inmate agree to submit specimen. (If no, indicate on Request for Urinalysis Test form.)

4. Was inmate handed specimen bottle indicating inmate's name, number, date, staff witness and other relevant information in ink or typed, and asked to acknowledge information on label is correct.

5. Was inmate pat-frisked prior to test to insure that specimen submitted is that of inmate, that witnessing employee observed urination in the specimen container, and that the employee was of same sex as the inmate (Report of Strip Frisk, Form 1140, completed if sufficient probable cause.)

6. If inmate did not provide urine specimen within three hours, did employee make appropriate entry on Request for Urinalysis Test form.

CHECK LIST (All must be completed)

Chain of custody completed on Form 2082 starting from employee observing urination .................................

Test conducted in facility hospital, clinic or other appropriate area ..........................................................

One copy of Form 2082 Request for Urinalysis Test accompanying specimen and original sent to Disciplinary Office ..............

Specimen should be delivered to laboratory whenever possible, or placed in secure storage refrigerator by person collecting the specimen .................................................

Specimen secured in refrigerator on unit ____ on ____ (Date) ____ (Signature)

Specimen removed from refrigerator on unit ____ on ____ (Date) ____ (Signature)

Specimen delivered to facility lab on ____ by ____ (Date) ____ (Signature) and received by ____ .

Specimen sent to outside lab for analysis on ____ by ____ (Date) ____ (Signature)

Joint Trial Exhibit #6 (86 Civ. 1916)

## APPENDIX B

Tier III Hearing – SOTO, Raul 78-A-4144 –
held at the Downstate Correctional Facility,
by Gordon Lord, Program Coordinator – February 26, 1985, March 5, 1985   –Page 1–

Gordon Lord:      "This is Downstate Correctional Facility. My name is Gordon Lord, Hearing Officer. This tape will record all proceedings for today's date, 2/26/85, being held in the hearing room of the

**26**

Adjustment Committee Suite, at Downstate. The time is now 10:45 a.m. and the date again is 2/26/85. Ah, this is a – with me in the room is Inmate Raul Soto, who I know from personal knowledge, ah; Officer R. Stone – Officer R. Stone, who, ah, is helping me record these proceedings. Um, this is a Tier III of the Three-Tier Disciplinary Procedure. The entire proceeding is recorded and you may have witnesses on your behalf. Nothing said by you at this hearing will be used against you in a criminal proceeding. Do you understand that?"

Raul Soto: "Yes, sir."

Gordon Lord: "Alright. Would you identify yourself, please, name and number."

Raul Soto: "My name is Raul Soto 78-A-4144."

Gordon Lord: "Alright, ah, formal charges were served on you by G. Hinkson, date 2/20/85, 11:00 a.m., ah,
Assistant Assigned: L.Cecilia, 2/20/85 at 11:00 a.m.
Now, the Misbehavior Report reads as follows:
Name of Facility: Downstate Correctional Facility
Misbehavior Report – Name of Inmate: Soto, Raul; Number: 78-A-4144; Cell 4-D-21.
Location of Incident: Tier III – meaning Tier Adjustment Committee Officers.
Date: 2/20/85; Time: 7:00 a.m.
Rule Violation: 113.12 Use of Narcotic or Controlled Substance.
Description of Incident: On 2/20/85, per National Health Lab, you were found with a 42 NG/ML or greater on the marijuana screen.
Collection Date: 2/15/85.
Reported – Report Dated: 2/19/85; Account 2299033.
Signed, dated 2/20/85 – G. Hinkson, C.O.
Was more than one inmate involved? No.
Ah, No. 6. is not applicable.
No. 7. – Was inmate locked in cell as a result of this incident? Yes
Was inmate locked in other housing unit? No.
Confinement was authorized by Lt. Rivenburgh.
Ah, now, for the record here, I have to get you to, ah, just make a simple statement, whether you admit or deny the charge."

Raul Soto: "Not guilty."

Gordon Lord: "Alright, so, you're denying the charge. Okay. What I'd like you to do, at this point, is to sign right here, indicating that you have, in fact, denied the charge."

C.O. Stone: "Date and time, right there. The date is 2/26/85; time is 10:47."

Gordon Lord: "The voice you're hearing is that of Officer Stone.
Alright. What we've got here is the Assistant Sheet, indicating that you, ah, have requested the following two witnesses: C.O. Ciangiola from Draft, ah; there's a parenthesis after here that says 30 minutes and C.O. Knapp, Sr., Draft, 20 minutes. What does the

Joint Trial Exhibit #7 (86 Civ. 1916)

Tier III Hearing – SOTO, Raul 78-A-4144                    -Page 2-

time frames mean? Is that——"

Raul Soto: "I spent about 30 minutes with Officer Ciangiola when I first walked into the facility from my furlough and then I spent about 20 minutes with Officer Knapp."

Gordon Lord: "Okay. Now, what we have – I'll go through all of the paperwork that I have here so that you're aware of what it is. That's the Misbehavior Report I already read. This is a report from National Health Labs, okay? – which, in fact says, ah, 'marijuana screen 42 NG/ML.' Okay? Guidelines of Profile is a drug screen, ah, which, basically just explains the normal testing process here, ah, this is, ah, a statement by you saying you've gotten a copy of that Profile of Drug Screen, Request for Urinalysis Testing and copy of the National Health Lab Report and also a copy of Chapters V and VI New York State Department of Correctional Services Rules and Regulations. This is a request for urinalysis test and Name: Raul Soto.
Request Made By: C.O. Knapp, dated 2/15/85.
Agent Suspected: Routine analysis for drug and alcohol – furlough return.

Action Leading to Request:   routine analysis - family reunion from
furlough.
Test Approved By: Lt. Utter, ah, Date:    2/15/85.
Inmate told the underlying reason why he is being ordered to submit
a urine specimen (circle one) - routine.
By:  R. Knapp; Date:  2/15/85 at 10:00 a.m. - 10:15 a.m.
Has inmate taken medication recently?  No.
Specimen witnessed and obtained by:  R. Knapp.
Specimen tested by:  the dates and times are all here.  I don't
think there's any great need to read them.  Ah,
Specimen tested by:  National Health Lab., 2/19/85.
Results:  42 NG/ML Marijuana Screen.
There's no completion here of second test.  Ah,
Chain of Custody:  Inmate Raul Soto to R. Knapp 2/15/85, 10:15 a.m.
from R. Knapp to refrigerator in hospital,
2/15/85, 10:25 a.m.
Urinalysis Check Sheet/Continuity Form, which is filled out here,
it's—indicates that you were ordered and why you've been ordered.
Was inmate asked if he has taken medication recently?  Yes.
Did inmate agree to submit specimen?  Yes.
Was inmate handed specimen bottle indicating inmate's name, number,
date, staff witness and other relevant information in ink or typed
and asked to acknowledge information on whether it was correct?  Yes.
Was inmate pat-frisked prior to test to insure that specimen
submitted is that of inmate?  Yes.
If inmate did not provide urine specimen within three hours, did
employee make appropriate entry on request?  Yes.
Chain of Custody Form?  Yes.
Test conducted in the facility hospital clinic or other appropriate
area?  Yes.
One form - one copy of Form 2082 sent to Disciplinary Office?  Yes.
Specimen secured in refrigerator in hospital - R. Knapp.
.Specimen removed from the refrigerator:  There is a nurse's signature
here.  I can't really read it, too well. Ah,
Specimen removed to the facility lab on 2/15/85 by - looks like
R. Ludden to me, who, I believe, is  an employee of National
Health Labs.  Alright, what do you have to say, Mr. Raul Soto?"

Tier III Hearing - SOTO, Raul 78-A-4144                          -Page 3-

Raul Soto:     "I'd like to refer back to your National Health Lab's report and
               I'd like you to read that label."

Gordon Lord:   "Label reads, 'Positive cannabinoid results should be confirmed by
               an alternate method.  If you wish further testing (at an
               additional charge), contact laboratory within 24 hours'."

Raul Soto:     "Do you know if that test was done?"

Gordon Lord:   "I have no record of it being done, no."

Raul Soto:     "So, this was never confirmed, so, we don't (unintelligible - backgrou
               noise) conclusive the test?"

Gordon Lord:   "Well, I'm not sure of that, but, I'll take that message and I'll
               find out."

Raul Soto:     "I appreciate it, Officer. This marijuana is a lie - that I had it
               when I walked in here.  That's why I specified the times on Officer
               Knapp and Officer Ciangiola.  That, ah, it's like I walked in here,
               high, from my furlough and that's why I asked Officer Knapp and
               Officer Ciangiola to verify that I walked in here, straight and
               narrow like I always did on my last furlough.  What I want to -
               what I want to specify to you, ah, Mr. Gordon Lord, you know - you
               know me personally.  The last 3½ years, everything that I've done
               on my record has been positive - school, graduated from Marist
               College, just got my degree, just got a letter from my job.  Doing
               something as ridiculous as this is like saying I'm going to throw
               away my whole future.  It's not within my character to do something
               like this.  That's my only defense because there has to be an error
               somewhere in this test.  I'm not saying Officer Knapp made a mistake
               or any - but, there has to be an error.  I do not do this.  Since
               1981, my life changed over.  I had a lot of trouble before 1981.
               In 1981, my father passed away.  I decided to look at my
               responsibilities to re-do my life and I've done that and I haven't
               had a ticket since then.  I finally went out on a successful

furlough. I went out on a job interview. I got my job. This is going to throw my whole life away. I'm going to throw it all away for a high? It's not like me. I'm my only person." (sic)

Gordon Lord: "You're saying that you did not use any marijuana while you were out on furlough?"

Raul Soto: "No, sir."

Gordon Lord: "Did you use anything at all?"

Raul Soto: "I had three heinikens on my birthday, which was February 10, 1985, with my family. I had fourteen members of our family in my house and I had three heinikens, which might, according to my, um, to my furlough papers says I can use alcohol but not to abuse it. If you won't believe me——"

Gordon Lord: "No, I'm familiar with this - agrees." (sic)

Raul Soto: "I've had - I've had thirteen family reunion visits, while I've been in this facility, so, I know the routine of these tests. I know what they test for. I don't use it. I have not used marijuana while I was on my furlough - on any of my furloughs.

Tier III Hearing - SOTO, Raul 78-A-4144                                  -Page 4-

Gordon Lord: "Alright, ah, let me just go to Officer Stone here and clarify something. Ah, didn't we, at one point, used to do our own urinalysis testing, here?"

C.O. Stone: "Yes, sir. Whenever they go to a family reunion, they, they - because we can only test for certain - certain items, we send them to the National Health Laboratories, where they test for everything. I can - I can give you a piece of paper. I'll show you something. I'll be right back. One second."

Gordon Lord: "Alright."

C.O. Stone: "I'm going to show you how long it can last in your system."

Gordon Lord: "Officer Stone is leaving the, ah, room, at this point. My current expectation is that I will talk to Officer Knapp. Officer Knapp would have been the first officer to have received you. The other officer, the other witness, I don't know if that's necessary, if what Officer Knapp says supports what you say - that you were not - you did not appear to be - okay? Ah, if there's any problems, if you - you, ah (unintelligible) disallow the testimony of Ciangiola only because that is conflicting; it doubles up on it. If there is a problem with it, they have to go to Knapp. We, ah——"

C.O. Stone: "This is from Emit System, which is the one that we use here. But, this will just give you a guidelines how long you can test for this drug."

Gordon Lord: "Alright. Marijuana use in typical level and marijuana users of one to four joints a week can be detected on this testing system for three to five days after discontinued smoking. Heavy drug uses of one joint or more per day are detectible for at least seven to ten days. One four-joint per day user was consistently positive for fifteen days after discontinuance. Ah, it then shows a pattern of alternating negative/positive results. It was positive on the twentieth and final day of study. Um, there's another simpler, less sensitive test, which, ah, in (unintelligible) moderate users would be good for one to two days after discontinuing smoking and heavy users for two to four days. We don't know if that is the same test that this National Health Lab uses. Okay. Now, I'll check on the types of calendars for testing whether or not a second test to confirm should be done and all that kind of stuff. What we're going to do, at this point, is get Officer Knapp in here, unless you have objections or there is something else you can say, at this time."

Raul Soto: "No, sir."

Gordon Lord: "What I have to caution you is that you are not allowed to question Mr. Knapp directly."

Raul Soto:      "Okay."

Gordon Lord:    "What you have to do is make all your questions to me. I will then
                relay them to Mr. Knapp. Sometimes I will restate the whole
                question or paraphrase this question. Sometimes I will just say –
                ask Mr. Knapp to respond to the question; but, you are not allowed
                to question Mr. Knapp directly."

Tier III Hearing – SOTO, Raul 78-A-4144                            –Page 5–

C.O. Stone:     "Officer Ciangiola will be here very shortly."

Gordon Lord:    "Oh, I was going to disallow his testimony, but, since he's coming
                up, we might as well hear from him.
                Officer Knapp, would you identify yourself for the record, please?"

C.O. Knapp:     "Officer Robert Knapp, Correction Officer."

Gordon Lord:    "Okay. Did you welcome this young gentleman, Raul Soto, back from
                his recent furlough?"

C.O. Knapp:     "Yes, I did."

Gordon Lord:    "And, this is the same furlough on which you took a urine specimen
                and filled out all the appropriate forms?"

C.O. Knapp:     "Yes, it is."

Gordon Lord:    "And the first question that Mr. Soto – Mr. Soto, I presume, wishes
                me to ask is, did you notice or detect any indication that he was
                under the influence of any drug at the time that he returned?"

C.O. Knapp:     "No, I did not."

Gordon Lord:    "Okay. Was there any hesitancy involved in him giving the urine test?
                Was there any indifference?"

C.O. Knapp:     "Mr. Soto gave us, ah, was processed in with no problems, at all.
                He gave the urine willingly. We had no hold up on it."

Gordon Lord:    "You also processed the Family Reunion Returns. Is that correct?"

C.O. Knapp:     "No, I did not."

Gordon Lord:    "So, this was your first contact with Mr. Soto in this kind of
                relationship?"

C.O. Knapp:     "Ah——"

Gordon Lord:    "On return, not worrying about clothing or anything else."

C.O. Knapp:     "Was this your first——"

Raul Soto:      "My second furlough."

C.O. Knapp:     "Second furlough. I have not – I don't recall if I did his first one
                or not when he returned——"

Gordon Lord:    "Alright."

C.O. Knapp:     "——cause I have a relief factor."

Gordon Lord:    "Okay. Mr. Soto, is there any other questions you wish to ask?"

Raul Soto:      "No other questions."

Gordon Lord:    "Okay. Is there anything you wish to contribute?"

C.O. Knapp:     "No, there isn't."

Tier III Hearing – SOTO, Raul 78-A-4144                            –Page 6–

Gordon Lord: "Thank you, Officer Knapp."

C.O. Knapp: "(unintelligible)."

Gordon Lord: "The question seems to be coming down as to whether or not the test itself, okay? - is appropriate, based on that label of step one, stating that it should be confirmed within 24 hours and the second furlough, engage in the use of marijuana. Um, and, whether or not the level reading, okay, would indicate, ah, what kind of use, right? Let me see, if you don't mind, the, ah, ah, furlough agreement that you signed, corrah, technically called a contract."

Raul Soto: "This one?"

Gordon Lord: "Any one. They're all condescending (sic) forms. I'm not really too concerned about. Ah, hm, hm, hm, hm - scanning it now, so tape will seem quiet for a bit. Alright. The item here that states - is the Item No. 6., I believe. 'I will not use, possess, purchase controlled substance or use or possess drugs that have been unlawfully obtained.' Ah, let's see the next statement. You've complied with everything else, it appears, so, what we really have to do, at this point, is wait for Officer Ciangiola, alright? I'll give you back your piece of paper. I'm going to go off the tape, ah, just to save tape, basically, unless you have any objections to it."

Raul Soto: "No, sir."

Gordon Lord: "During this time, I would refrain from talking about anything that deals specifically with these charges. Is that okay?"

Raul Soto: "Okay."

Gordon Lord: "The hearing was adjourned at 11:03 and the time is now 11:08. Officer Ciangiola - I hope I'm saying his name right - close enough - is present.
Could you verbally identify yourself?"

C.O. Ciangiola: "My name is Officer William Ciangiola. I work in the Draft Reception Area."

Gordon Lord: "Okay. What the inmate basically wants asked is, during the time that you processed this man in from his furlough, did you notice any indication whatsoever that he was under the influence of anything?"

C.O. Ciangiola: "I didn't process him in. I was in the Reception Area when he came in. I spoke to him for about twenty minutes, waiting for the officer to process him and he didn't appear to myself to be under the influence of anything - okay, as far as he was responsive and his eyes weren't glassy or anything to that affect."

Gordon Lord: "Alright. Is there any other questions you want me to ask this officer?"

Raul Soto: "No, sir."

Gordon Lord: "Ah, you have had much experience in terms of receiving inmates and noticing those kind of things——"

Tier III Hearing - SOTO, Raul 78-A-4144

-Page 7-

C.O. Ciangiola: "Right."

Gordon Lord: "——when an inmate is not behaving normally or is apparently under the influence of something, correct?"

C.O. Ciangiola: "Correct."

Gordon Lord: "Alright. Is there anything else you'd like to add?"

C.O. Ciangiola: "No, that's all, you know."

Gordon Lord: "Okay, very good. Is there any other questions you'd like me to ask?"

Raul Soto: "No, sir."

Gordon Lord:    "Alright, Officer, thank you very much."

C.O. Ciangiola:  "Fine. (sic)
What I'm going to do, at this time, is I'm going to adjourn the
hearing, ah, until I can get back, after checking out with
competent medical authority what this sticker - label - actually
means and what a reading of 42 NG/per milliliter actually means.
Ah, I have no idea when I'll be getting back to you, okay? The
question is, though, that if there is, ah, if you seem to remember,
at any time, of being in an area where any kind of illegal drugs
were used, whether you used them or not yourself, okay? - whether
it be a public area, such as a bar, or a nightclub or something like
that. I'd appreciate you're letting me know it the next time
around. Alright? Ah, but, in the meantime, I have to adjourn the
hearing until such time as I get more up-to-date on what this test
results actually - actually means because you've raised the questions
about how high the  reading is, ah, and what that second label
actually means, alright? Do you have any questions or problems?"

Raul Soto:    "No, sir."

Gordon Lord:    "One thing I have to do - I do have to ask you, ah, you don't have
any trouble understanding the English language?"

Raul Soto:    "No, sir."

Gordon Lord:    "You don't have any trouble understanding the proceedings that have
gone on, today?"

Raul Soto:    "No, sir."

Gordon Lord:    "Do you have any need of a Spanish interpreter for any of these
proceedings?"

Raul Soto:    "No, sir."

Gordon Lord:    "Okay. I presumed, since I already knew you were able to converse in
English, that you didn't need that. I just wanted to clarify it for
matters of the record.
Alright. This hearing is adjourned at 11:11 a.m.

---

Tier III Hearing - SOTO, Raul 78-A-4144        -Page 8-

Gordon Lord:    "Okay. The date is 3/5/85. The time is 10:12 a.m. My name is
Gordon Lord, Hearing Officer. Ah, this is Downstate Correctional
Facility. This is a continuation hearing of Tier III Misbehavior
on Inmate Raul Soto 78-A-4144. Ah, with me in the room, which is
one of the rooms in the Adjustment Committee Suite, is Officer
Stone, who is helping me to record the hearing; Inmate Raul Soto,
who I know from personal knowledge and myself. Ah, theoretically,
I'm supposed to read all this stuff to you - the formal charges
were served by Officer Hinkson, on 2/20/85, at 11:00 a.m. The
Assistant assigned was L. Cecilia, 2/20/85, 11:00 a.m. The charge
is 113.12 Use of Narcotic and Controlled Substance. Ah, the main
thing I really am supposed to read to you and get you to do here is -
I keep forgetting this thing - is that, ah, this is a Tier III of the
Three-Tier Disciplinary Procedure. The entire proceeding is recorded
You may have witnesses on your behalf. Nothing said by you, at this
hearing, can be used against you in a criminal proceeding. Do you
understand that?"

Raul Soto:    "Yes."

Gordon Lord:    "Okay. Originally, when we first started this thing, you said that
you denied all the charges. Do you wish to change your plea, at
this time?"

Raul Soto:    "No, sir."

Gordon Lord:    "Alright, Mr. Soto. I've heard all the evidence from all the
witnesses that you asked to provide, which was Officer Knapp and
Officer Ciangiola. Ah, I've heard your statements. Ah, I did a
little bit further investigation through Captain Acosta. Um,
basically, the National Health Labs utilizes the same, ah, testing
procedure that we use here at the facility. The reason we send it

Ah, the notation here, I've checked with the Nurse Administrator, Ms. Carpenter, the, ah - there's a notation on the medical - on the laboratory analysis report from National Health Labs. It says that, 'Positive cannabinoid result should be confirmed by an alternate method. If you wish further testing (at an additional charge), contact laboratory within 24 hours.' Ah, there are two basic statements concerning that. Number one, the laboratory is saying that if we wish a confirmation of the level, okay - um, you're not questioning the validity of the exam, alright? Just a matter of whether or not you would test out at 42 NG per milliliter or whether it would be 43 or 78 or 21 or whatever the number would be. They're not questioning the fact that there is a positive result. It has been told to me by either Captain Acosta or Ms. Carpenter that there is a 99% validity rate in this testing, okay, so, 99 out of 100 times, this testing result is going to be correct - alright - which, scientifically, is a very, very high indicator of correctness, if you want to use that word. Now, in reviewing the testimony in my mind, over these last few days, okay - I notice that you said that while you were out on furlough, you did not use any controlled substance, specifically marijuana. The question I have to ask you is did you happen to use anything prior to your going out on furlough?"

Raul Soto: "No."

Gordon Lord: "So, what we have very simply is a case where we have the chemical evidence on a reasonably valid test that, within your system, ah----"

Tier.III Hearing - SOTO, Raul 78-A-4144                    -Page 9-

Raul Soto: "Unintelligible) you had asked me if I remembered anything that I didn't, um, say in the first hearing - like I said, I was on a public bus for about 6½ minutes with my wife. We were going shopping. There were about five kids in the back of the bus. They were smoking marijuana. While I was sitting on the bus, I could have inhaled the stuff. That's the only way possible that I could think of that I would come in contact with it in any way, manner or form since I started going out on furlough."

Gordon Lord: "Okay. This reading - this indication, here, I believe, I read to you once before."

Raul Soto: "Yes."

Gordon Lord: "This kind of level result would indicate a much more involved contact with it than -ah, than you're indicating, at this point. Um, there isn't very much I can do, at this point. Okay. Um, the simple reality is that we have chemical evidence that you, in some way, ingested, ah, something, okay? - that gave you a positive result for a cannabinoid. I'm not saying you ate marijuana. I'm saying, in some way, either you smoked it, or, in some other way, ingested it. Ah, while it is true that, ah, the officers testified that you came back and you did not show any signs of intoxication, or being under the influence of, the results, ah, the testing results does indicate that you had involvement, ah, and, really, what we've got here is a case where there is, apparently, at this point, administrative surety, alright? There is a reasonable, ah, pile of evidence here that indicates that you did, in fact use marijuana. Now, unless you have something further to say or unless you wish to----"

Raul Soto: "The only thing I have to say is that I was on a furlough in January, within twenty days before this test was taken and I was tested, then. That's all I have to say."

Gordon Lord: "Alright. Well, then, basically, the only thing we have to do, at this point, is complete the paperwork here because I'm - based on this ah, this preponderance of evidence, 'I'm going to have to find you guilty of 113.12 Use of Narcotic or Controlled Substance. Okay. The Statement of Evidence Relied Upon is the MHL National Health Labs----

to Officer: Where is the Urinalysis----
(pause)
Reasons for Disposition, Penalty Imposed is the----
(long pause)
The penalty imposed will be a Sixty-Day Confinement to SHU or Cell and a Sixty-Day Loss of Commissary, Phone----"

C.O. Stone: "Packages, also?"

Gordon Lord: "Packages - and - Release Date——"

C.O. Stone: "April 21st."

Gordon Lord: "——21/1985."

Tier III Hearing - SOTO, Raul 78-A-4144          -Page 10-

Raul Soto: "Is that cell confinement?"

Gordon Lord: "(Unintelligible)
At the discretion of the Watch Commander. We have - I'm sorry, I signed in the wrong location. Okay. Just sign under where I scratched out my name, here - Inmate's Signature. Mr. Soto, because of my personal knowledge of you, I feel very bad about this circumstance. I wish there was something that we could do, ah, but, as I said to you, the preponderance of evidence is clear here. We've got a very reliable examination. We've got a clear chain of evidence. Ah, unfortunately, there isn't very much else that we can do in terms of that."

Raul Soto: "I feel, ah, feel the sentence is excessive - excessive, because, when Eddie Carson, I remember, about eight months ago, had the exact same problem, he got thirty days in his cell. I understand he lost all his privileges, but (unintelligible) amount of time."

Gordon Lord: "The reason that we're assessing that penalty is, as I stated - on the 'Reasons for the Penalty Imposed' - ah, is the severity of using narcotics in or while on release from a correctional facility, ah, the possession of which, in a correctional facility, is also a violation of law. Ah, possession of it out on the street is a violation of law. Ah, I understand that the consumption of such is not a violation of law. While it may sound severe to you, it apparently, as far as I can tell, is roughly comparable to defined penalties that are being imposed in this type of facility at this level of security. You may appeal, in writing, to the Commissioner.

to Officer: Ah, Mr. Stone, isn't this bottom paragraph changed? The Superintendent is out or did we put the Superintendent back on?"

C.O. Stone: "The Superintendent is out. We still use the old forms, sir."

Gordon Lord: "Okay, so, you can appeal this disposition to the Commissioner. There is no time limit on it, but, I would recommend that you do it within thirty days."

C.O. Stone: "Okay. Is there any further comments you wish to make, Mr. Soto?"

Raul Soto: "No, sir. I would like to go back to my cell and get my house in order."

Gordon Lord: "Okay. This hearing is terminated at 10:25 on 3/5."

---

I, Betty Symer, do hereby certify that I recorded, stenographically, the proceedings herein, at the time and place noted in the hearing thereof, and the foregoing is an accurate and complete transcription of same, to the best of knowledge and belief.

*Betty Symer*
Betty Symer,
Principal Stenographer

Sworn to before me this _18th_ day of

_May_____, 1987.

(affix stamp)

**34**

Notary Public

VICKI N. PETERS
Notary Public, State of New York
4709693 Ulster
Qualified in Dutchess County
Commission Expires March 30, 1968